Wachtler, J.
Both of these appeals concern the very sensitive and troublesome issues relating to the nature and extent of police conduct toward private citizens. In People v De Bour the order of the Appellate Division should be affirmed; in People v La Pene the order of the Appellate Division should be reversed.

People v De Bour

This case raises the fundamental issue of whether or not a police officer, in the absence of any concrete indication of criminality, may approach a private citizen on the street for the purpose of requesting information. We hold that he may. The basis for this inquiry need not rest on any indication of criminal activity on the part of the person of whom the inquiry is made but there must be some articulable reason sufficient to justify the police action which was undertaken.
At 12:15 a.m. on the morning of October 15, 1972, Kenneth Steck, a police officer assigned to the Tactical Patrol Force of the New York Police Department, was working the 6:00 p.m. to 2:00 a.m. tour of duty, assigned to patrol by foot a certain section of Brooklyn. While walking his beat on a street illuminated by ordinary street lamps and devoid of pedestrian traffic, he and his partner noticed someone walking on the same side of the street in their direction. When the solitary figure of the defendant, Louis De Bour, was within 30 or 40 feet of the uniformed officers he crossed the street. The two policemen followed suit and when De Bour reached them Officer Steck inquired as to what he was doing in the neighborhood. De Bour, clearly but nervously, answered that he had just parked his car and was going to a friend’s house.
The patrolman then asked De Bour for identification. As he was answering that he had none, Officer Steck noticed a slight waist-high bulge in defendant’s jacket. At this point the policeman asked De Bour to unzipper his coat. When De Bour complied with this request Officer Steck observed a revolver protruding from his waistband. The loaded weapon was re *214 moved, from behind his waistband and he was arrested for possession of the gun.
At the suppression hearing Officer Steck testified to the above facts noting that the encounter lasted "a few minutes”. On cross-examination, Officer Steck stated that at the time he believed defendant might have been involved with narcotics and crossed the street to avoid apprehension. On the other hand the defendant testified that he never saw the police until they crossed the street in front of him and that he continued walking straight ahead. He stated that the police asked him where he was going and also whether he had any dope in his pockets. He answered that he had been visiting at his mother’s home with relatives. De Bour further testified that during this encounter, Steck’s partner proceeded to pat his clothing and two or three minutes later Steck found the gun and fired it in order to see whether it was operable. At the conclusion of this hearing the court found Officer Steck’s testimony to be credible and denied the motion to suppress. Subsequently De Bour pleaded guilty to felonious attempted possession of a weapon and was sentenced to a conditional discharge. The Appellate Division unanimously affirmed, without opinion.
Prior to reaching the merits we must consider the People’s contention that defendant has failed to preserve the issue of the legality of the officers’ initial encounter and questioning of defendant. We find no merit to their position and consider People v Robinson (36 NY2d 224) inapposite. That case dealt solely with the failure to object to the charge and the requirement that for purposes of review such an objection must be registered at a time when the court is in a position to rectify the alleged error (CPL 470.05, subd 2). However, when the defendant moves to suppress evidence and specifically challenges the authority of the police to accost the defendant as well as the subsequent search we believe that the issue has been preserved. Nor is review of this case barred by the holding in People v Tutt (38 NY2d 1011) where we held that an issue will not be preserved if the defendant fails to raise it at a time when the People would have an evidentiary opportunity to counter his assertion. In contrast, here the defendant’s suppression papers asserted, inter alia, that the initial restraint by the police was effected without consent, warrant, court order, or other lawful authorization. Neither can it be said that defense counsel did not pursue this point in view of the effort on cross-examination of the prosecution’s only wit *215 ness, Officer Steck, to ascertain the precise reason he and his partner decided to approach the defendant. The mere emphasis of one prong of attack over another or a shift in theory on appeal, will not constitute a failure to preserve (see, e.g., People v Arthur, 22 NY2d 325, 329; Dewey v Des Moines, 173 US 193, 198).
Turning to the merits, we must consider first the legality of the initial encounter and then the subsequent intrusion into De Bour’s jacket. The appellant contends that when the two uniformed patrolmen confronted De Bour and "caused him to stand still” he was seized within the meaning of the Fourth Amendment. Defendant reasons that he was deprived of his freedom of movement by the obvious show of authority and the equally obvious display of force by virtue of his being outnumbered by armed officers. Relying on People v Cantor (36 NY2d 106) appellant urges that a police initiated street encounter with a citizen amounts to a seizure which is unconstitutional unless supported by at least a founded suspicion predicated on specific articulable facts that criminal activity is afoot. The People counterargue that the stop here was conducted in accordance with the principles enunciated in People v Cantor (supra). They contend that De Bour’s crossing the street to avoid the officers in an area where there was a high incidence of narcotics crimes triggered a duty to ascertain whether there was any criminal activity afoot. Both parties misconstrue the holding in Cantor.
As noted in Cantor whether or not a particular search or seizure is to be considered reasonable requires a weighing of the government’s interest against the encroachment involved with respect to an individual’s right to privacy and personal security (at p 111). Thus, we must consider first whether or not the police action was justified in its inception and secondly whether or not that action was reasonably related in scope to the circumstances which rendered its initiation permissible.
Considering the justification at its inception, we first address the People’s interpretation of the Cantor opinion. Their argument that the patrolmen were authorized to ascertain whether there was any criminal activity is a sheer bootstrap. Before the police may stop a person pursuant to the common-law right to inquire there must exist at that moment a founded suspicion that criminal activity is present (People v Cantor, supra; People v Rosemond, 26 NY2d 101). The police may not justify a stop by a subsequently acquired suspicion *216 resulting from the stop. This reasoning is the same which refuses to validate a search by what it produces (e.g., People v Scott D., 34 NY2d 483, 490). To validate this stop under the common-law power to inquire, we must examine the knowledge possessed at that moment and any reasonable inferences. Although this analysis involves a less stringent degree of belief than probable cause, it should be approached in the same manner so as to permit the use of familiar signposts as points of reference.
We have frequently rejected the notion that behavior which is susceptible of innocent as well as culpable interpretation, will constitute probable cause (People v Davis, 36 NY2d 280; People v Oden, 36 NY2d 382; People v Russell, 34 NY2d 261; People v Corrado, 22 NY2d 308). It is equally true that innocuous behavior alone will not generate a founded or reasonable suspicion that a crime is at hand. (Compare People v Martinez, 37 NY2d 662, and People v Allende, 39 NY2d 474, with People v Singleteary, 35 NY2d 528, and People v Green, 35 NY2d 193.) Here, we agree with the appellant that this encounter was supported by less than reasonable suspicion and consequently would not justify a stop involving actual or constructive restraint.
We turn now to the appellant’s interpretation of Cantor (supra). Contrary to the appellant’s assertions, Cantor should not be read as .a blanket prohibition of all police-citizen encounters conducted in the absence of probable cause or reasonable suspicion based on concrete observations. To be sure, police officers may not seize an individual, either physically or constructively, without some articulable justification (People v Cantor, 36 NY2d 106, 111, supra; Terry v Ohio, 392 US 1). However, not every encounter constitutes a seizure.
We have defined a seizure of the person for constitutional purposes to be a significant interruption with an individual’s liberty of movement (People v Cantor, 36 NY2d 106, 111, supra). Our recent decisions have emphasized the primacy of the right to be free from aggressive governmental interference. In Cantor (supra) the actions of three plain-clothes officers in surrounding the defendant with revolvers drawn and blocking his vehicle with their own was considered an unconstitutional seizure. Similarly, in People v Ingle (36 NY2d 413, 418) where a motorist was "accosted” and "restrained” for a "routine traffic check” we held that this constituted a "limited seizure within the meaning of constitutional limita *217 tions” (see, also, People v Martinez, 37 NY2d 662, supra, and People v Allende, 39 NY2d 474, supra). The conduct of the policemen in the instant case presents a sharp contrast to these last-mentioned cases. Here De Bour was merely approached and questioned by two uniformed officers whose conduct bespoke no violent or forcible apprehension. Clearly then, De Bour was not seized in the sense that Cantor and Ingle were.
Despite the lack of a forcible seizure here all constitutional considerations do not disappear. The basic purpose of the constitutional protections against unlawful searches and seizures is to safeguard the privacy and security of each and every person against all arbitrary intrusions by government. Therefore, any time an intrusion on the security and privacy of the individual is undertaken with intent to harass or is based upon mere whim, caprice or idle curiosity, the spirit of the Constitution has been violated and the aggrieved party may invoke the exclusionary rule or appropriate forms of civil redress. It is in this vein that the defendant urges that his right as a citizen to walk the streets unimpeded by the State has been trammelled.
While we agree that the patrolmen here had no articulable reason to seize forcibly, or arrest the defendant, we cannot say that the defendant’s right to be free from an official interference by way of inquiry is absolute. Were we to carry the defendant’s interpretations of Cantor and the Constitution to their logical extreme we would have to conclude that when the police possess a need or desire to initiate an encounter with a private individual they must be prepared to seize him or else do nothing. This approach is hardly reasonable and if adopted would probably lead to an overcompensation in the form of a dilution of the standards embracing reasonable suspicion or probable cause. "The history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would 'leave law-abiding citizens at the mercy of the officers’ whim or caprice’ ” (Wong Sun v United States, 371 US 471, 479; Henry v United States, 361 US 98). Common sense and a firm grasp of the practicalities involved compel us to reject an all or nothing approach. The crucial factor is whether or not the police behavior can be characterized as reasonable which, in terms of accepted standards, requires a balancing of the interests involved in the police inquiry (People v Ingle, 36 *218 NY2d 413, 419, supra; Terry v Ohio, 392 US 1, 20-21, supra; Camara v Municipal Ct, 387 US 523, 536-537; People v Cantor, 36 NY2d 106, supra; People v Kuhn, 33 NY2d 203, 209).
The role of the police in our society is a multifaceted one. On the one hand the police are mandated to enforce the law; yet the extent to which this authorizes the police to investigate or to prevent crime is ambiguous at best. On the other hand, and more important, we must recognize the multiplicity and complexity of tasks assumed by the police. As public servants, the police perform the lion’s share of services expected of local government. Among other functions, the police in a democratic society are charged with the protection of constitutional rights, the maintenance of order, the control of pedestrian and vehicular traffic, the mediation of domestic and other noncriminal conflicts and supplying emergency help and assistance (see ABA Standards for the Urban Police Function 1.1, subd b; see, also, La Fave, "Street Encounters” and the Constitution: Terry, Sibron, Peters and Beyond, 67 Mich L Rev 40, 61-62). To consider the actions of the police solely in terms of arrest and criminal process is an unnecessary distortion. We must take cognizance of the fact that well over 50% of police work is spent in pursuits unrelated to crime (see, generally, Wilson, Varieties of Police Behavior, at p 19; Misner, Enforcement: Illusion of Security, 208 The Nation 488; Bercal, Calls for Police Assistance, 13 Am Behavioral Scientist 681). Consequently unrealistic restrictions on the authority to approach individuals would hamper the police in the performance of their other vital tasks. This is not to say that constitutional rights to privacy and freedom from unreasonable searches and seizures must be abandoned to accommodate the public service aspect of the police function. The overriding requirement of reasonableness in any event, must prevail.
Generally, in the performance of their public service functions, not related to criminal law enforcement, the police should be given wide latitude to approach individuals and request information. For instance, no one would quarrel with a police officer’s right to make inquiry of passers-by to find the parents of a lost child. We have consistently recognized the obligation of policemen to render assistance to those in distress (e.g., People v Mitchell, 39 NY2d 173, and authorities cited therein). However, when police officers are engaged in *219 their criminal law enforcement function their ability to approach people involves other considerations and will be viewed and measured by an entirely different standard of reasonableness. Unfortunately, there is scant appellate authority on this subject,[1] even the majority of the Supreme Court in the Terry trilogy explicitly avoided resolving the constitutional propriety of an investigative confrontation (Terry v Ohio, 392 US, at p 19, n 16, supra, but see the separate concurrences of Justices Harlan and White, who maintained that there is no doubt that a policeman can address questions to anyone on the street, at pp 32, 34). Nevertheless the practical necessities of law enforcement and the obvious fact that any person in our society may approach any other person and attempt to strike up a conversation, make it clear that the police have the authority to approach civilians. While the extent of this power may defy precise definition it would be unrealistic to say it does not exist at all.
Due to the tendency to submit to the badge and our belief that the right to be left alone is "too precious to entrust to the discretion of those whose job is the detection of crime” (McDonald v United States, 335 US 451, 455), a policeman’s right to request information while discharging his law enforcement duties will hinge on the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter. Thus, while it might be reasonable for the police at the scene of a crime to segregate and interview witnesses, the same procedures would not be justified if done on a whim or caprice (see People v Ingle, 36 NY2d *220 413, 420, supra). One aspect of law enforcement warrants particular mention and that is the area of crime prevention. Since this function is highly susceptible to subconstitutional abuses it will be subject to the greatest scrutiny; for whereas a policeman’s badge may well be a symbol of the community’s trust, it should never be considered a license to oppress.[2]
Applying these principles to the instant case, we believe that the police officers legitimately approached De Bour to inquire as to his identity. The encounter here was devoid of harassment or intimidation. It was brief lasting only a few minutes and the questions were circumscribed in scope to the officers’ task as foot patrolmen. Significantly, the encounter did not subject De Bour to a loss of dignity, for where the police degrade and humiliate their behavior is to be condemned. In addition, the crime sought to be prevented involved narcotics and the Legislature has declared that to be a serious crime (see People v Broadie, 37 NY2d 100). Moreover, the attendant circumstances were sufficient to arouse the officers’ interest. The encounter here occurred after midnight in an area known for its high incidence of drug activity (People v Oden, 36 NY2d 382, 385, supra) and only after De Bour had conspicuously crossed the street to avoid walking past the uniformed officers. In evaluating the police action in light of the combined effect of these factors we conclude that rather than being whimsical it was reasonable. Hence the police officers were authorized to make the brief limited inquiry that they did.
Our next concern is whether or not the pistol was properly confiscated. The appellant, relying on People v Sanchez (38 NY2d 72) contends that the undefined bulge at the waistband *221 did not justify Officer Steck’s request that he unzip his jacket. We cannot agree. Our holding in Sanchez (supra) is distinguishable on two grounds. In the first place the officer in Sanchez did not testify that the hard object he accidentally touched felt like a weapon (at pp 74-75). Here, the patrolman testified that when he noticed the bulge at the waistband he "took it to be a gun”. The location of the bulge is noteworthy because unlike a pocket bulge which could be caused by any number of innocuous objects, a waistband bulge is telltale of a weapon (compare People v Watson, 48 AD2d 815). Viewed in the context of a late night encounter on a lonely street coupled with the apparently evasive crossing of the street, the officers should have been expected to request clarification as to the source of the waistband bulge which was in fact a .38 caliber Smith & Wesson revolver. Secondly, Sanchez is inapposite by virtue of the extent of the intrusion. The patrolman did not throw the defendant against the wall and thrust his hand into his pockets as in Sanchez (cf. Sibron v New York, 392 US 40) nor did he embrace the defendant in a bear hug (People v Bronk, 31 NY2d 995). In contrast the intrusion here was extremely minimal—Officer Steck simply requested that De Bour open his jacket and the officer never touched him until after he saw the pistol butt protruding from the belt. In our view, the officer’s justifiable apprehension that De Bour was armed coupled with the minimal intrusion rendered the police action consonant with the respect and privacy of the individual and as such was reasonable.
Having concluded that the initial encounter was lawful in its inception and that the subsequent intrusion was reasonably limited in scope and intensity we agree that there should have been no suppression and the order of the Appellate Division should be affirmed and the conviction of De Bour sustained.

People v La Pene

This case presents a counterpoint to De Bour. Here too, the police had a suitable predicate, an anonymous phone tip, to approach the defendant and make inquiry. However, neither that predicate nor ensuing events or exigencies amounted to reasonable suspicion so as to justify the precipitate frisk of this defendant. Consequently the weapon seized as a result of that search should have been suppressed.
The evidence adduced at the suppression hearing reveals *222 that on the morning of December 4, 1971 Officer Dennis Sheeran and his partner were assigned to uniformed radio motor patrol in Queens, New York. At about 1:45 a.m. they received a radio message from central communications that there was a male Negro with a gun, wearing a red shirt, in a place called Jean’s Bar. This information was the result of an anonymous phone call. The policemen responded and arrived at the scene simultaneously with another radio patrol unit. After noticing no unusual conditions outside, the four uniformed officers entered the bar. One officer stationed himself at the front, another at the side. Officer Sheeran and his partner went directly to the rear of the bar as soon as they saw the defendant, Milton La Pene, who was wearing a red shirt. At this time La Pene was standing in the back of the establishment with his hands in his pockets and was apparently engaged in conversation with some other patrons. La Pene was wearing a red shirt or overblouse which was worn outside his trousers and draped to a point below his waist.
An examination of the record reveals that the policemen did nothing to verify or substantiate the information received over the radio. Neither the patrons nor the bartender were approached or questioned. Officer Sheeran conceded on cross-examination that on entering the bar he made no attempt to ascertain whether or not there were other Black men present wearing red shirts. He further testified that La Pene’s conduct was neither suspicious nor furtive and that he did not see a bulge at defendant’s waist or any other indication that La Pene was armed. Nevertheless, without asking a single question Officer Sheeran ordered the defendant to "freeze” and raise his hands. The policeman then frisked defendant and discovered a .25 caliber Titan automatic pistol containing seven live rounds. La Pene was immediately handcuffed and arrested for felonious possession of a weapon.
After his motion to suppress the handgun was denied, Le Pene pleaded guilty to attempted felonious possession of a weapon and was sentenced to probation. A divided Appellate Division affirmed. The issue before our court is whether or not the anonymous telephone tip which was received in this instance was sufficient to justify the ensuing police conduct.
In evaluating the police action we must consider whether or not it was justified in its inception and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible (People v Cantor, 36 NY2d 106, *223 111). We bear in mind that any inquiry into the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions. By this approach various intensities of police action are justifiable as the precipitating and attendant factors increase in weight and competence. The minimal intrusion of approaching to request information is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality (People v De Bour, supra). The next degree, the common-law right to inquire, is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure (People v Cantor, 36 NY2d, at p 114, supra; People v Rosemond, 26 NY2d 101; People v Rivera, 14 NY2d 441, 446, and authorities cited therein). Where a police officer entertains a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor, the CPL authorizes a forcible stop and detention of that person (CPL 140.50, subd 1; see Terry v Ohio, 392 US 1; People v Cantor, supra). A corollary of the statutory right to temporarily detain for questioning is the authority to frisk if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed (CPL 140.50, subd 3). Finally a police officer may arrest and take into custody a person when he has probable cause to believe that person has committed a crime, or offense in his presence (CPL 140.10). This synopsis represents the gradation of permissible police authority with respect to encounters with citizens in public places and directly correlates the degree of objectively credible belief with the permissible scope of interference.
In the instant case the information possessed by the police along with the attendant circumstances including any exigencies must be evaluated in order to assess the legality of the police action. Since the right to request information as delineated in De Bour (supra) and the common-law right to inquire do not extend to a frisk, the only possible justification for the instant frisk may be in the statutory right of the police to "stop and frisk”. The People, unable to provide elucidation as to the caller or the caller’s basis of knowledge, rely solely on the information transmitted by the anonymous phone call as supplying reasonable suspicion. We find this contention unper *224 suasive in light of our recent holdings in People v Lypka (36 NY2d 210), People v Green (35 NY2d 193) and People v Johnson (30 NY2d 929). The Lypka case focused on the issue of whether or not a police officer is entitled to assume the veracity of a radio bulletin from a department or fellow officer and to proceed on the strength of that communication. We held that when the bulletin prima facie furnishes probable cause, the knowledge possessed by the sender should be imputed to the receiver who will be presumed to act with the requisite probable cause (at p 213). We noted however that when challenged by a suppression motion this presumption would disappear and the People would be required to demonstrate that the sender had probable cause (at p 214) or that the independent observations of the searching officer were sufficient to justify the action taken (at p 213, n 2, citing People v Riseman, 29 NY2d 278, 284).
Although we are considering a less stringent degree of belief, i.e., reasonable suspicion, a parity of reasoning compels similar analysis in the case at bar. Our first inquiry is whether the information communicated was sufficient, prima facie, to establish reasonable suspicion. If the information was insufficient prima facie we must examine the attendant circumstances and exigencies to determine whether or not an independent basis of reasonable suspicion existed. Stated differently, the crucial question is what degree of belief was reasonably generated by the information transmitted over the radio? On the record before us, we do not believe that it was sufficient to sustain a reasonable suspicion that Milton La Pene unlawfully possessed a concealed handgun. In arriving at this conclusion we have examined the quality and content of the information communicated to the police officers and the circumstances surrounding the encounter.
As to the information transmitted, it is significant though not determinative to note that it was garnered from an anonymous source. Not only was this information imparted by a person whose identity was unknown, it was communicated via a nonpersonal medium. Tips of this nature are of the weakest sort since no one can be held accountable if the information is in fact false (Penal Law, § 240.50) and there is no way to assure, by way of intangibles such as voice, facial expression or emotional state, that the information was communicated and received accurately and was believable (compare People v Green, 35 NY2d 193, supra, where an unknown *225 informer personally approached the officer and pointed to the defendant as he walked toward them; see, also, People v Bronk, 31 NY2d 995, affg 66 Misc 2d 932). Judicial uneasiness with anonymous information has recently been expressed by our court and the United States Supreme Court (see, e.g., People v Green, 35 NY2d, at p 196, supra; People v Taggart, 20 NY2d 335, 343; Adams v Williams, 407 US 143, 146). Indeed our court in Taggart characterized the use of anonymous information to justify intrusive police action as "highly dangerous” (People v Taggart, 20 NY2d, at p 343, supra).
The information under consideration here is also deficient in content inasmuch as there was no specificity or individualized detail in the description given. While it is true that in some instances a single distinctive feature will suffice to indicate a particular person, that was not the case here where the tipster merely indicated that the suspect was a Black man with a red shirt. Couched in vague and general terms this information presented relatively little guidance to those acting upon the tips; thereby raising the real possibility that La Pene was not the person the informer meant. This possibility is especially bothersome in view of the police officer’s candid admission that he did not check to see whether there were other Black men in red shirts present, and a concession that there might well have been. In addition, while the informer reported that the suspect had a gun in his possession a report of possession by itself will not authorize police action of the intensity resorted to here. As noted in Green (supra) "[t]here is a difference of significant degree between a report only that a person has a gun in his possession and another report that a person not only has a gun but that he has just used it for the commission of a crime” (35 NY2d, at p 196). Of course, where the report indicates that the person has used the weapon to menace or threaten or will use the weapon if stopped for questioning or the weapon has such potential destructive power as to dispel any possible legitimate possession, then personal and public safety may well mandate a more intensive police intrusion.
We are cognizant of the fact that police-citizen encounters are dynamic situations during which the degree of belief possessed at the point of inception may blossom by virtue of responses or other matters which authorize and indeed require additional action as the scenario unfolds. However, the instant confrontation was not such a situation and the circum *226 stances, taken independently or cumulatively, did not supply the requisite degree of belief to sustain a frisk.
As previously described the situation confronting Officer Sheeran and his brother officers was not one fraught with tension or hostility. They entered a bar which has not been characterized as being located in a high-crime area and about which they had received no reports of criminal or dangerous activity, other than the anonymous phone call. In contrast to the patrolman in De Bour who saw the waistband bulge, Officer Sheeran testified that he did not notice any external sign of the weapon on La Pene’s person. In addition, the arresting officer acknowledged that La Pene was not acting in a suspicious or furtive manner, a factor which would have lent credence to the tip. Moreover, there was no pressing urgency to act in order to defuse a volatile situation or to prevent escape. Despite this absence of exigency, the four policemen approached the first person they spotted who fit the vague description, ordered him to "freeze” and then frisked him—all without asking a single question (compare, e.g., People v Rosello, 36 AD2d 595; People v Joslin, 32 AD2d 859).
The security and constitutionally guaranteed rights of our citizenry would be severely eroded if we were to tolerate this type of police action predicated on no more than an anonymous tip. Certain tips are so devoid of reliability, either inherently or by lack of corroborating factors, that they warrant either no response at all or necessitate further inquiry before intrusive police measures would be permissible (Adams v Williams, 407 US, at p 146, supra). Had the police proceeded with the inquiry to which they were entitled, they may well have been able to determine whether or not a crime was occurring and whether or not La Pene was the perpetrator. As it was, the police resorted to the type of aggressive behavior which cannot be condoned.
Accordingly, the judgment and order of the Appellate Division with respect to La Pene should be reversed and the indictment dismissed.

. One court has opined that the dearth of authority is attributable to the fact that criminal defendants rarely challenge the right of the police to confront them (United States v Bonanno, 180 F Supp 71, 78). Another, more plausible explanation, one which was alluded to previously is that these police practices are low visibility tactics (see, e.g., Sibron v New York, 392 US 40, 52). Nevertheless it is our view that the authority may be inferred from various decisions. Traces of this authority are apparent in the cases involving the vaguely formulated common-law right of inquiry (see, e.g., People v Rosemond, 26 NY2d 101, supra; People v McKie, 25 NY2d 19; People v Entrialgo, 14 NY2d 733, affg 19 AD2d 509). The most obvious context in which this authority inferentially appears is the determination of when custodial interrogation exists for purposes of rendition of Miranda warnings (e.g., People v Rodney P. [Anonymous], 21 NY2d 1). We also discern the outer limit of the right to ask questions in those cases involving arrests for minor offenses. A refusal to identify oneself or explain one’s presence has been rejected as a predicate for arrest in recent cases (see, e.g., People v Stokes, 32 NY2d 202; People v Schanbarger, 24 NY2d 288; People v Merolla, 9 NY2d 62; see, generally, ALI Model Code of Pre-Arraignment Procedure, [P. O. D.], § 110.1, and commentary, at p 257 et seq.).

. It is also instructive to note at this point that law enforcement agencies utilize a wide variety of techniques to eradicate conditions conducive to criminal activity and to create an atmosphere of security (see, generally, G. O’Connor & C. Vanderbosch, The Patrol Operation). To a certain extent these methods may infringe on the privacy and freedom of individuals. Unfortunately, where the police are motivated by factors other than prosecution, the threat of the exclusionary rule is to no avail (see Terry v Ohio, 392 US, at pp 12-15, supra; see, also, La Pave, 67 Mich L Rev 39, 59-61). Even when prosecution results, the exclusionary rule is an ineffective means of reviewing offensive police practices since these practices are frequently insulated by the process of plea bargaining (Amsterdam, The Supreme Court and the Rights of Suspects in Criminal Cases, 45 NYU L Rev 785). The only reason that such "subconstitutional lawlessness” is mentioned is to highlight the inability of the courts to deal with this problem effectively and to suggest that the solution may be in the strengthening of administrative control (Breitel, Controls in Criminal Law Enforcement, 27 U Chi L Rev 427; see, also, ABA Standards for the Urban Police Function, 4.1).