Fuchsberg, J. (dissenting).
In my view, the order of the Appellate Division, which suppressed the avails of an illegal search and seizure, did no more than correctly , enforce constitutional safeguards designed to prevent unreasonable trespasses on the liberties which mark us as a free people. Believing, therefore, that today’s reversal lowers the barriers and, by doing so, impermissibly substitutes a deeper dependence on the grace and discretion of those in authority for the much more secure protections of proved principle, I would vote to affirm.
This case grows out of an anonymous telephone message received by the police and then relayed to the officer on a radio run. Only about a year and a half ago in People v La Pene (40 NY2d 210, 224), we expressly stated that "Tips of this nature”—conveyed by an unknown, unseen, and unidentified individual through a nonpersonal medium—are among the "weakest sort” of justifications for police action. Such calls are notoriously false and malicious; even in instances where they include some descriptive details that would help identify the particular persons against whom anonymous communications are directed, much more often than not they "expose innocent persons to harassment by pranksters and irresponsible meddlers” (People v Green, 35 NY2d 193, 196). Moreover anyone who ultimately undertakes to act on a tip which he or she did not receive firsthand will be handicapped by lack of exposure to the informer’s voice, facial expressions, gestures, and other evidence of emotion, mind or motive which ordinarily are so essential to our estimates of the reliability of what we are told by even nonanonymous strangers. It is therefore no surprise that a recent Vera Institute of Justice report entitled Felony Arrests: Their Prosecution and Disposition in New York Courts (xi-xii [1977]) indicates that as many as 90% of such tips may prove to be unfounded.
In the recent past, this high order of unreliability has caused us, rightly I think, to impose a twofold caution on those who proceed on the basis of an anonymous tip whose source cannot be verified or held to account. First, if practical, there should be a careful search for indicia of reliability in the caller and his story. Second and more important, in the manner and extent of any intrusion on person and privacy precipitated by such a call there must be an exercise of restraint compatible with the limited nature of the verifica *905 tion that has taken place and the inherent unreliability of a person who will not disclose who he is.
The anonymous information here was that an armed man walking with a limp and wearing a red jacket and sneakers had just been seen entering a "red front building” on Fifth Avenue near 115th Street in Manhattan. It is notable that there was no suggestion that the man had ever committed or was about to commit a crime or that he had otherwise demonstrated a disposition to use the weapon he carried, a gun, for such a purpose (cf. People v Green, supra, p 196). Repairing to the scene on that limited information alone, a police officer saw the defendant Robert McLaurin. It is conceded that what McLaurin was then doing was innocuous enough: he was walking in the street. It appears that the area was well lit. There was nothing furtive or unusual in his manner. Nor was there the slightest indication that he would be other than completely and placidly responsive to the police. There was no weapon in his hands and no revealing, or even, suspicious, "bulge” in his clothes to suggest that he was in fact armed (cf. People v La Pene, supra, pp 210, 226). Only one other person was on the street at the time; there was nothing remarkable about him either.
Nevertheless the policeman paused for no preliminary inquiry whatsoever. He did not even attempt to engage Mc-Laurin in conversation, though the defendant had shown no inclination to leave the scene and though the officer expected two fellow officers who had entered a nearby building to join him in seconds.
Instead, gun in hand, and without any attempt at "verbal and visual inquiry” (People v Stewart, 41 NY2d 65, 69) he proceeded first to forcibly stop and then to begin to search McLaurin, in the course of which the latter readily admitted possessing the revolver which became the subject of the suppression motion. In so approaching him, the policeman employed a gesture more forceful than the "bear hug” we condemned in People v Bronk (31 NY2d 995, affg on opn at App Term 66 Mise 2d 932).
In sum the officer’s intrusion far exceeded what the circumstances would have permitted. Initially, at least, a lesser measure, such as a stop to inquire, had to be employed (see People v Townes, 41 NY2d 97, 101). Significantly, in other cases in which this court has upheld searches that followed upon tips reporting possession of a gun there was no display of *906 arms (see People v Stroller, 42 NY2d 1052 [though defendant unresponsive to officer’s questions]; People v Williams, 41 NY2d 65 [despite prior official encounters with defendant and presence of suggestive bulge]; see, also, People v Kinlock, 43 NY2d 832).
In the end, the result in a case such as this one must depend on whether there is a reasonable basis to act on the assumption that the individual targeted by the anonymous caller is armed with a gun and would use it against the officer. It is then a matter of where and how we draw the line. If our liberties are not to be dissolved, the line must not be fixed by reaction to exaggerated public fears or to the hysteria of the moment. Surely, if we hearken to such cries too easily, more lawbreakers will be apprehended. But then far, far larger numbers of lawabiding people will be readily and regularly exposed to insult and intrusion, as will the quality of our society. Both our State and Federal Constitutions were intended to keep that from happening.
Order reversed, etc.