■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DORIS CHAMBERS, Appellant.—Motion, insofar as it seeks reargument, granted and, upon reargument, the order of this court entered on July 10, 1979 [71 AD2d 559] is amended to delete the word "unanimously" from the decretal paragraph thereof and to add at the end of said decretal paragraph the following: "Murphy, P. J., and Fein, J., dissent in a memorandum by Murphy, P. J." Concur—Murphy, P. J., Birns, Fine, Markewich and Ross, JJ.

Murphy, P. J. (dissenting). Detective Edward Maste was the sole witness to testify at the suppression hearing. On the evening of July 30, 1973, Maste was on radio patrol duty with other officers. At about 10:15 P.M., the detective received a radio call that shots were fired at 164-172 West 141st Street, Apartment No. 5E, in Manhattan. Maste and his fellow officers responded to this first call but they did not find any indication that shots had been fired in Apartment No. 5E or, for that matter, in the entire building. Maste received a second run at about 10:45 P.M. He asked for further information since the first call had proven unfounded. The radio dispatcher informed Maste that a female had called. The dispatcher also stated "that it was a known narcotics location to the caller of this job". He told Maste that the correct apartment was 5I rather than 5E. On this second radio run, the officers listened outside the door of Apartment No. 5I for approximately one minute before knocking. Voices and music were heard inside the apartment. Officer Costello then knocked on the front door. After a period of silence, a female voice asked who was there. The officers announced their identity. After another period of silence, the officers began to knock again. The same female voice told the officers that she had just taken or was about to take a shower. At about this same time, the officers heard scuffling within the apartment. At that point in time, Maste went to the roof to prevent any escape from the rear of the apartment. As Maste was about to descend the rear fire escape, the window of Apartment No. 5I opened. The detective stepped back into the shadows of the roof. He then observed a black woman with red hair, later identified as Doris Chambers, place an orange waste basket and a package on the fire escape; both the basket and the package were filled with multicolor balloons. Thereafter, the black female placed on the fire escape a plastic bag filled with what appeared to be powder or sand. From his experience, Maste knew that balloons were often used to pack narcotics. While a sergeant watched the rear fire escape, Maste ran from the roof to the fifth floor apartment. As he arrived at the apartment, the door opened about three or four inches. A black female, later identified as Yvonne Lee, stated that she was alone in the apartment. Since Maste had seen a different female in the rear of the apartment, he knew that Lee was lying. At that juncture, Maste directed his officers to push into the apartment. Lee was immediately placed under arrest. The officers then rushed to the back bedroom where they found defendant and several other individuals around two card tables. A subsequent search revealed that the basket and box on the fire escape contained 1,424 balloons filled with heroin. The plastic bag on the fire escape contained that same narcotic. The officers also found small quantities of marihuana and cocaine inside the apartment. The defendant and her associates were placed under arrest by the police. A police officer is entitled

to act on the strength of a radio bulletin. Where the bulletin, prima facie, furnishes probable cause to make an arrest and a search, the police officer may effect the arrest and the search. The sender's knowledge is in effect, imputed to the receiver. However, on a subsequent motion to suppress, bare reliance on an unsubstantiated hearsay communication from a radio dispatcher will not suffice for probable cause *(People v Lypka,* 36 NY2d 210, 213-214). At most, a radio call based upon an anonymous phone tip will generate a belief that criminal activity is afoot *(People v Stewart,* 41 NY2d 65, 69). Hence, on the first radio run, the police merely had reasonable suspicion to believe that an individual might be firing shots in Apartment No. 5E. The reliability of that anonymous phone tip was initially cast in doubt when the police found no evidence that shots had been fired in Apartment No. 5E. Of course, it is possible that the female tipster had given the correct apartment (5I) but that the radio dispatcher had erroneously broadcast an incorrect apartment (5E). For purposes of discussion, it will be assumed that the dispatcher inadvertently sent the officers to an incorrect apartment on the first run. It will also be assumed, although this fact is not evident from the record, that the tipster called a second time to inform the police of their initial mistake. The police, on the second run, should have become even more suspicious of the reliability of the anonymous complaint since the activity overheard in the apartment was quite normal. During one of her calls, the tipster apparently told the dispatcher that Apartment No. 5I was a known narcotics location. Since there was no reason to place any reliability in the tipster's primary complaint of shots being fired, the police had even less reason to place any credence in the tipster's secondary complaint concerning the narcotics activity in the apartment. Absent independent evidence of some drug trafficking, the police had, at the very most, a common-law right to make inquiry *(People v La Pene,* 40 NY2d 210, 223). This common-law right of the police to make inquiry was somewhat strengthened when they discovered the multicolor balloons on the rear fire escape. These balloons were often used in a packaging mill. Consequently, the police had a founded reason to suspect that criminal activity was afoot when Lee falsely stated that she was alone in the apartment. The police, however, do not have probable cause to make an arrest simply because they observe an individual carrying or· transferring tinfoil packets *(People v Maldonado,* 59 AD2d 692) manila envelopes *(People v Corrado,* 22 NY2d 308); or bottles *(People v Amarosa,* 55 AD2d 621). Despite the fact that the foregoing receptacles are often used in the narcotics trade, the possibility remains that they could be used for many lawful purposes. Detective Maste had reason to suspect the actual contents of the balloons and the real motive of the occupants in placing those balloons on the fire escape. Nonetheless, the detective did not know with certitude whether the balloons were being used as party accessories or heroin receptacles. If safety had permitted, the officer could have approached the balloons and plastic bag to confirm his suspicion. If closer observation had revealed the powder to be heroin, then an intrusion into the apartment would have been warranted. Notwithstanding this speculation, the fact remained that the occupants of Apartment No. 5I had relinquished control over the balloons and the bag. The detective and the sergeant accompanying him could have remained on the roof and taken those measures as were necessary to prevent the destruction of the balloons and the plastic bag. In the interim, the other officers, at the apartment door, could have made appropriate inquiry and, if necessary, sought a search warrant. Instead, Maste and his fellow officers pushed their way into the apartment without probable cause and arrested

all the occupants. The evidence seized after this unlawful intrusion and arrest must be suppressed (cf. *People v Williams,* 20 NY2d 388). Accordingly, the judgment of the Supreme Court, New York County, rendered September 29, 1975, convicting defendant, upon her plea of guilty of criminal possession of a dangerous drug in the second degree and sentencing her to an indeterminate term of incarceration not to exceed four years, should be reversed, on the law, the motion should be granted and the indictment dismissed as against defendant Chambers.