■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JAMES PINCKNEY, Respondent.—Order, Supreme Court, New York County (Jerome Marks, J.), entered January 14, 1985, granting defendant's motion to suppress physical evidence and statements allegedly made by him, unanimously reversed, on the law and the facts, the motion denied and the matter remanded for further proceedings.

Defendant was charged with criminal possession of a weapon in the third degree. At the hearing to suppress the gun recovered from him and certain statements which he made it was established that unidentified teen-agers had advised Transit Officer Febo that a man was "playing detec-

tive" at the Lenox Avenue station. As Febo and his partner and two other transit officers descended the subway stairway they noticed that those exiting the station were looking behind them. One man stated, "There were detectives down there." As Febo entered the station via the exit gate a man, later identified as defendant, bumped him and asked if he had a pass. Febo replied that he was a police officer and became curious when defendant failed to ask to see his identification. When Officer Callahan asked defendant if he was from the task force defendant stated that he was "from the two-eight." Febo and Callahan assumed from his answer that defendant was a police officer assigned to the 28th Precinct. Thinking that defendant might be assigned to surveillance since he was in mufti, the officers decided to give him some room and moved away. Two trains entered the station and departed. Defendant never moved.

Suspicions aroused, and curious, since anticrime units work in teams, Callahan then asked defendant about the whereabouts of his partner. Defendant said that he was at the next station. Callahan's suspicions only increased since he believed that a police officer rarely lets his partner out of sight. Febo noticed that a radio was protruding from defendant's rear trouser pocket. Febo thought that such a display was unusual for a plain-clothes officer. In response to a request that he produce identification defendant handed Callahan a sergeant's auxiliary police shield, a store detective shield and an identification card. Asked if he had any radios, defendant gave Callahan a Transit Police Department radio and a New York Police Department radio. Knowing that auxiliary police officers are prohibited from working in plain clothes the officers decided that Febo should notify the district desk officer and the auxiliary police coordinator, and request that a supervisor respond.

When Febo returned to the station Callahan asked defendant to identify the Transit Police and auxiliary police coordinators. He also asked if defendant had a weapon, to which defendant responded, "No." Both officers noticed, however, that defendant began to stutter and sweat, and to shift his eyes in different directions. Believing "something's wrong with this guy" Febo and Callahan grew fearful for their safety. Callahan explained that he was concerned for the officers' safety and told defendant that he was going to search him. Defendant cooperated by turning and putting his hands on the wall. Starting with the top of his arms Febo patted down the outside of defendant's jacket and felt a hard object near the

left underarm. He then pulled out a loaded .25 caliber automatic pistol from a shoulder holster inside the jacket. When asked, defendant said that he did not have a license for the weapon, which he had purchased in another State. The court suppressed the gun and defendant's statements. It found that, although they acted properly up until Febo's phone call, "the officers jumped the gun on this case" since there was no indication at any time that defendant posed a threat to any police officer.

Since we find that the officers' conduct in this matter was justified in its inception and was reasonably related in scope to the circumstances which rendered its initiation permissible (cf. People v Cantor, 36 NY2d 106, 111), we reverse and deny suppression of the gun and statements. After defendant bumped Febo and asked for his pass Officer Callahan was warranted in asking him if he was a member of the task force. Despite his answer defendant continued to arouse the officers' suspicions by his attire, the apparent absence of a partner, the unconcealed radio and his failure to ask Febo for his identification. Further inquiry, which was justified, revealed that defendant was not a police officer at all, but a member of the auxiliary police who were not authorized to work in plain clothes. In view of defendant's possession of police paraphernalia, i.e., the shields and two police radios, the officers were further justified in asking defendant if he had a weapon. Defendant's negative response did nothing to assuage their concern for their safety, especially when he began to show signs of agitation. At this juncture the officers were justified in subjecting defendant to the limited intrusion of a patdown.

The officers' conduct was reasonable throughout. They showed restraint and made no effort to subject defendant to any greater intrusion than questioning until it became apparent that he was not a police officer, and that their safety and the safety of others was imperiled. There is no evidence in the record that defendant was stopped on a pretext or that the officers were improperly motivated. Since the minimal action taken by the officers was justified the gun and statements, which were not the product of custodial questioning (see, People v De Bour, 40 NY2d 210, 220), should not have been suppressed. Concur—Sandler, J. P., Sullivan, Bloom, Lynch and Kassal, JJ.