Peradotto, J.
(dissenting in part). I respectfully dissent in part because I disagree with the majority that defendant was illegally detained in violation of his Fourth Amendment rights. I would therefore affirm the judgment in appeal No. 1 convicting defendant, upon his plea of guilty, of burglary in the second degree (Penal Law § 140.25 [2]) but, like the majority, I would affirm the judgment in appeal No. 2.
In the early morning hours of July 16, 2004, the Irondequoit Police Department received a telephone call from a local Town Justice who reported a suspicious male “[p]ossibly stealing bikes.” In response to the report, a police officer drove to the residence of the Town Justice, who showed the responding officer a bicycle in his driveway and told the officer that his newspaper carrier had stopped a man who was pulling that bicycle while riding another bicycle. The newspaper carrier suspected that the man, whom she described as a black male wearing a dark hooded sweatshirt and jeans, might be stealing bicycles in the area. The officer returned to his patrol car and began checking the area for the suspect.
Shortly thereafter, at approximately 6:21 a.m., the officer observed defendant, a black male wearing a dark hooded sweatshirt and greenish-colored jeans, emerging from a backyard on a bicycle. The officer sent a dispatch that he saw a person matching the description of the possible bicycle thief, and he drove toward defendant. Defendant, who had been riding in the street, steered his bicycle onto the sidewalk. The officer pulled up alongside defendant and asked him to stop. Defendant did not comply, possibly because he did not hear the officer. When the officer repeated his request, defendant complied. The officer stopped and then exited his patrol car, and walked over to where defendant was standing on the sidewalk.
Defendant testified at the suppression hearing that the officer told him that he “wanted to ask [defendant] a few questions, a couple questions.” The officer testified that he approached defendant and “told him that we had a report of a suspicious male possibly stealing bikes and that the description of the male was a male black wearing a darker . . . hooded sweatshirt and jeans, and as you can see you fit the description, so I just have to make an inquiry and you’ll be on your way if everything’s okay.” On cross-examination, the officer similarly testified that, when *1529 he initially stopped defendant, “I told him why I stopped him . . . [J]ust to keep him at ease. I told him after everything checks [out], you’ll be on your way.”
The officer then asked defendant a number of questions, including his name, whether he owned another bike, where he had been, what he was doing in the neighborhood, whether he lived in the neighborhood, and why he had emerged from a backyard. Defendant denied having a second bicycle. As the officer was questioning defendant on the sidewalk, the newspaper carrier arrived at the scene and identified defendant as the person she had observed earlier in the morning with the two bicycles. The officer testified that the newspaper carrier arrived “[w]ithin a short time” after he stopped defendant.
At the suppression hearing, defense counsel extensively questioned the officer about the timing of the newspaper carrier’s arrival, noting that a supporting deposition taken by another officer from the newspaper carrier placed her arrival at 6:45 a.m. Defense counsel asked the officer whether the supporting deposition would “refresh [his] memory as to what time [the newspaper carrier] happened on the scene of the stop,” and the officer replied, “I already told you it was during the conversation shortly after I stopped him that she arrived.” When asked whether he had a “specific independent recollection of the time,” the officer replied, “I do have a very good recollection that it was shortly after I stopped him . . . While I was talking to him while I was making my inquiry as to who he is, where he’s coming from, does he live here, why [did] you come from somebody’s yard and what’s going on.” The officer’s testimony that the newspaper carrier arrived shortly after he stopped defendant and while he was making his initial inquiries of defendant is supported by defendant’s own testimony at the suppression hearing. Defendant estimated that “approximately three minutes” elapsed from the time he was stopped until the time the newspaper carrier arrived.
After the newspaper carrier identified defendant, the officer asked defendant why he had lied about having a second bicycle. The officer then left defendant on the sidewalk with a second officer while he “check[ed] the houses that [defendant] emerged from, the yards,” for evidence of a break-in. The first officer testified that he checked the exterior of three houses and woke up the occupants to ask if they were okay, a process that he testified took a “short time.” Within approximately 15 minutes, a third officer arrived with a civilian who identified the bicycle that defendant was riding as his own. At that point, the police placed defendant under arrest and issued Miranda warnings. *1530 During subsequent interrogation, defendant admitted that he stole the two bicycles in his possession that morning.
Contrary to the conclusion of the majority, I conclude that the court properly refused to suppress the statements defendant made to the arresting officer. It is well established that “[gjreat deference is afforded the findings of the suppression court” (People v Davis, 48 AD3d 1120, 1122 [2008], lv denied 10 NY3d 957 [2008]; see People v Prochilo, 41 NY2d 759, 761 [1977]), and that “[t]he suppression court’s credibility determinations and choice between conflicting inferences to be drawn from the proof . . . will not be disturbed unless unsupported by the record” (People v Esquerdo, 71 AD3d 1424, 1424 [2010], lv denied 14 NY3d 887 [2010] [internal quotation marks omitted]; see People v Sanders, 74 AD3d 1896 [2010]; People v Youngblood, 294 AD2d 954, 955 [2002], lv denied 98 NY2d 704 [2002]).
In evaluating police conduct, we “must determine whether the action taken was justified in its inception and at every subsequent stage of the encounter” (People v Nicodemus, 247 AD2d 833, 835 [1998], lv denied 92 NY2d 858 [1998]). Here, the suppression court determined that, when the officer first encountered defendant on the bicycle, the report from the Town Justice coupled with the officer’s observations provided a founded suspicion that criminal activity was afoot and thus justified the second level of intrusion under People v De Bour (40 NY2d 210 [1976]), i.e., the common-law right of inquiry (see People v Moore, 6 NY3d 496, 498-499 [2006]; De Bour, 40 NY2d at 223). I agree. The officer observed defendant, who fit the description of the reported possible bicycle thief, emerging from a residential backyard on a bicycle during the early morning hours, shortly after the report and approximately one block away from the location of the second bicycle. The officer was thus permitted to effect “a detention short of a forcible seizure to obtain explanatory information” (People v White, 35 AD3d 1263, 1264 [2006], lv denied 8 NY3d 947, 951 [2007]; see Moore, 6 NY3d at 500; De Bour, 40 NY2d at 223). The officer therefore was justified in approaching defendant, asking him to stop, requesting his name, and asking him various questions about his conduct and the bicycle he was riding.
I likewise agree with the suppression court’s further determination that, when the newspaper carrier arrived and identified defendant as the individual she had seen pulling the second bicycle, the officer had reasonable suspicion to believe that defendant had committed a crime so as to “support the temporary detention of the defendant for further investigation.” The majority does not take issue with that determination of the sup *1531 pression court, but concludes that defendant was illegally “detained” for 24 minutes following the stop by the first officer on the scene. I disagree.
In my view, the facts do not support the majority’s determination that, “after first being asked for identifying information, defendant was held for 24 minutes while the first officer at the scene went to residences in the neighborhood searching for evidence of a crime.” Although the testimony at the suppression hearing is not entirely clear on this point, it appears that the first officer checked the surrounding houses for signs of a break-in after the newspaper carrier identified defendant, i.e., in the 15 minutes between the newspaper carrier’s arrival on the scene and the civilian’s identification of the bicycle defendant had been riding. When defense counsel asked the first officer “[w]hat was the purpose of staying for another 15 minutes or more after [the newspaper carrier] had said that’s the guy that I took the bike from,” the first officer replied that he was “not done with [his] check of the yards” or his inquiry as to why defendant had lied about possessing a second bicycle.
Notably, defendant stated in support of his suppression motion that, “[a]fter [the newspaper carrier] identified the defendant as the person she had seen earlier, the Irondequoit Police Department conducted a house-to-house canvass of the neighborhood to determine if anyone had been the victim of a theft” (emphasis added). Moreover, the suppression court specifically found that the newspaper carrier arrived during the officer’s initial questioning of defendant. In its decision, the court stated that, “[w]hile the [first] officer was obtaining information from the defendant, . . . the newspaper carrier . . . arrived and identified the defendant as the person she observed earlier pulling the bike left in [the Town Justice]’s driveway.” Thus, according due deference to the suppression court’s findings (see Prochilo, 41 NY2d at 761; Davis, 48 AD3d at 1122), I submit that the record does not support the majority’s conclusion that the police “held” defendant while the first officer canvassed the neighborhood for evidence of a crime.
In any event, even assuming, arguendo, that the first officer searched nearby houses prior to the arrival of the newspaper carrier, I conclude that defendant was not thereby subjected to a level three forcible detention (see Moore, 6 NY3d at 498-499). The Court of Appeals has defined “a seizure of the person for constitutional purposes to be a significant interruption with an individual’s liberty of movement” (De Bour, 40 NY2d at 216). In People v Ocasio (85 NY2d 982, 984 [1995]), the Court explained that the determination whether a seizure occurred *1532 “requires the fact finder to apply a settled standard: whether a reasonable person would have believed, under the circumstances, that the officer’s conduct was a significant limitation on his or her freedom.” Such a determination “involves consideration of all the facts — for example, was there a chase; were lights, sirens or a loudspeaker used; was the officer’s gun drawn, was the individual prevented from moving; how many verbal commands were given; what was the content and tone of the commands; how many officers were involved; [and] where did the encounter take place” (id,.).
The record reflects that the entire encounter, which did not exceed 24 minutes, took place on a public sidewalk, and that defendant was not handcuffed or restrained in any manner (see People v Anthony, 85 AD3d 1634, 1635 [2011], lv denied 17 NY3d 813 [2011]; cf. People v Evans, 294 AD2d 918, 918-919 [2002], lv dismissed 98 NY2d 768 [2002]). No officer displayed a weapon, the police did not act in an abusive or threatening manner, and there was no evidence that the police physically blocked defendant or otherwise interfered with his freedom of movement (see Ocasio, 85 NY2d at 984; cf. People v Layou, 71 AD3d 1382, 1383 [2010]). While defendant was standing on the sidewalk, he consumed a soda and snacks that he had with him (see People v Smith, 234 AD2d 946 [1996], lv denied 89 NY2d 1041 [1997]). The first officer testified that defendant never asked to leave or complained that he was treated with disrespect. Concerning the issue whether defendant was free to leave, the first officer testified that, “[i]f [defendant] said I’m leaving unless you’re going to handcuff me . . . [, h]e would have been walking. I already knew his name.” “Although it may be possible that [defendant] felt obliged to cooperate with the police in order to maintain his facade of innocence, this subjective view by the defendant does not require that we find him to have been in custody” (People v Yukl, 25 NY2d 585, 591-592 [1969], cert denied 400 US 851 [1970]).
Finally, I disagree with the majority that a reasonable person in defendant’s position would not have felt free to leave after the first officer told defendant that he “just ha[d] to make an inquiry and you’ll be on your way if everything’s okay” or “after everything checks [out], you’ll be on your way.” The officer testified that he made a statement to that effect upon first approaching defendant “just to keep him at ease” and to explain why he had stopped defendant. Defendant did not testify concerning any such statement by the first officer, recalling only that the first officer approached and told him that he “wanted to ask [defendant] a few questions, a couple questions.” In my *1533 view, the first officer’s statement, unaccompanied by any showing of force or other facts suggesting that defendant was not free to leave, did not elevate the level two encounter to a level three forcible detention (see People v Lopez, 71 AD3d 1518, 1518-1519 [2010], lv denied 15 NY3d 753 [2010]; People v Bent, 206 AD2d 926, 926 [1994], lv denied 84 NY2d 906 [1994]).
I would therefore affirm the judgments in appeal Nos. 1 and 2. Present — Scudder, P.J., Centra, Peradotto, Lindley and Martoche, JJ.