People v Jones (2022 NY Slip Op 00878)





People v Jones


2022 NY Slip Op 00878


Decided on February 9, 2022


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on February 9, 2022
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

BETSY BARROS, J.P.
CHERYL E. CHAMBERS
JOSEPH A. ZAYAS
DEBORAH A. DOWLING, JJ.


2018-12099
 (Ind. No. 1101/17)

[*1]The People of the State of New York, respondent,
v
Khalik Jones, appellant.


Laurette D. Mulry, Central Islip, NY (Edward E. Smith and Lisa Marcoccia of counsel), for appellant, and appellant pro se.
Raymond A. Tierney, District Attorney, Riverhead, NY (Grazia DiVincenzo and Glenn Green of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Suffolk County (William J. Condon, J.), rendered October 2, 2018, convicting him of criminal possession of a controlled substance in the third degree and loitering in the first degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of those branches of the defendant's omnibus motion which were to suppress physical evidence and statements he made to law enforcement officials.
ORDERED that the judgment is reversed, on the law, those branches of the defendant's omnibus motion which were to suppress physical evidence and his statements to law enforcement officials are granted, and the matter is remitted to the Supreme Court, Suffolk County, for further proceedings on the indictment.
At a suppression hearing, former police officer, now Detective Michael Petrucci testified that, on the morning of May 26, 2017, he and another officer were at the Mastic/Shirley rail station investigating two narcotics tips regarding premises located at 125 Patchogue Avenue in Mastic. The first tip had been made to the Suffolk County Police Department, and provided the cell phone number of an individual named Nicholas Flores, who was alleged to be selling heroin from that location. Detective Petrucci testified that the second tip was received anonymously from "the city," and "gave information about a subject that went by the name of DA that would come from the city, take the train to the Mastic/Shirley rail station in the morning, deal heroin all day from 125 Patchogue Avenue in Mastic and then . . . take that train back home. Because he was on parole, he had to be back into the city by his curfew." Although the second tip did not provide any physical description of DA, Detective Petrucci testified that he knew from "interaction[s] on the street or a traffic stop or an arrest" that the person known as DA "was a black male subject approximately 30—mid 30s, tall, bald . . . head" who was said to "dress clean."
Detective Petrucci testified that, a little after 10:00 a.m., he observed a dozen people getting off the train. Most of them went to their cars, but "[o]ne black male subject exited that platform on foot and began walking out of the parking lot." The man—whom Petrucci identified in court as the defendant—was bald, in his mid-30s, and was wearing jeans and a shirt. The [*2]defendant met up with a white female and walked into a deli across the street from the station. After about five minutes, the defendant exited the deli and walked eastbound on Patchogue Avenue. The defendant stopped at 123 Patchogue Avenue, which is a residence, and went inside.
Detective Petrucci testified that he had personally made numerous arrests at 123 Patchogue Avenue, and described those premises as "probably our number one community complaint in the precinct," and the site of "numerous overdoses." He testified that "it's just a known location for users and dealers to operate out of." The location in question was next door to 125 Patchogue Avenue, which was the location mentioned in the tips. Detective Petrucci testified that he had conducted controlled buys at 123 Patchogue Avenue with confidential informants, and had observed hand-to-hand transactions, as well as overdoses, people using narcotics, and people dealing narcotics.
Detective Petrucci testified that, as soon as the defendant arrived at 123 Patchogue Avenue, "the volume of traffic, both vehicle and pedestrian, picked up significantly." He clarified that meant "cars in and out, people in and out on bikes, on foot." The defendant was "in and out" of the house at 123 Patchogue Avenue numerous times. Detective Petrucci continued to observe the defendant over the course of approximately one hour. At one point, Detective Petrucci observed a black Lincoln Navigator pull into the driveway area of 123 Patchogue Avenue, and the defendant "walked over" and "leaned in the front driver's side window" of that vehicle. Detective Petrucci testified that the defendant and the driver engaged in a "very quick and secretive" interaction that was "consistent with a narcotics transaction." On cross-examination, Detective Petrucci clarified that during that interaction his view of the defendant was from the passenger side of the Lincoln Navigator, so he "could see just general body movements, that's all," and see that the defendant was "at that driver's side window, that's all." He could not hear anything that was being said, and "did not see an exchange of money and drugs."
Detective Petrucci testified that he next saw a light-colored SUV traveling westbound on Patchogue Avenue. The vehicle parked several houses away from 123 Patchogue Avenue, and then a white male exited the vehicle and walked toward the driveway of 123 Patchogue Avenue, where he met the defendant and "exchanged in a secretive exchange consistent with narcotics activity." On cross-examination, Detective Petrucci testified that he "saw a quick hand-to-hand interaction" between the white male and the defendant, but he "did not see any money or drugs," and he agreed that it could have been a handshake. Detective Petrucci then observed a "Hispanic male" walk up to the defendant and the white male in the driveway. The three males had a "quick" interaction, and then dispersed.
At this point, Detective Petrucci felt "comfortable and confident enough" to investigate the three subjects. Detective Petrucci approached the defendant with his "Taser out" and his shield displayed. The defendant was "very compliant" and placed his hands behind his back, and Detective Petrucci placed the defendant in handcuffs. He asked the defendant if he had any weapons or contraband on him that he should know about, and patted the defendant down, but found nothing, including any drugs or currency. After patting the defendant down, Detective Petrucci left him standing outside of the police vehicle. The Hispanic male, who identified himself as Jason Gonzalez Mugaburu, stated that he was there "to buy drugs from DA." No drugs or currency was found on Mugaburu, only a crack pipe. The white male, who was identified as Nicholas Flores—the man mentioned in one of the tips—stated that he was there because he owed "DA" some drug money. No drugs or currency were found on Flores, so the officers "cut him loose."
On cross-examination, Detective Petrucci clarified that the defendant was "detained" at the time he was initially approached and handcuffed, and was arrested for loitering approximately 30 minutes later, after the police officers had spoken to Mugaburu and Flores, at which point the defendant was placed inside the police vehicle and brought to the precinct station house. However, Detective Petrucci conceded that paying someone for a prior drug transaction is not a crime, and that no drugs or currency were found on the defendant, Flores, or Mugaburu. After the defendant was arrested and brought to the precinct station house, another officer noticed a bag containing a powdery substance in the back seat area of the police vehicle where the defendant had been sitting. The [*3]substance later tested positive for heroin.
The defendant was charged with drug possession and loitering offenses. Prior to trial, he moved to suppress the bag of heroin and statements he made to police officers after his arrest that he "tried ditching the bag of drugs in the car" and that he "had to resort to taking street drugs as my meds aren't strong enough." After the hearing, the Supreme Court denied those branches of the defendant's omnibus motion.
Contrary to the People's contention, the defendant's contention that he was arrested without probable cause is preserved for appellate review. In his pretrial omnibus motion, the defendant requested a "probable cause hearing," and sought suppression on the ground that he was seized and detained by the police without a legal basis. Furthermore, in response to the defendant's contention that the police officers lacked probable cause to arrest him, the Supreme Court determined that "[t]he facts surrounding the arrest of Defendant conform to the body of law beginning with People v DeBour." Thus, the court "expressly decided" the issue of whether the defendant was arrested without probable cause (CPL 470.05[2]).
In People v De Bour (40 NY2d 210), the Court of Appeals established a "graduated four-level test for evaluating street encounters initiated by the police" (People v Moore, 6 NY3d 496, 498). The first level "permits a police officer to request information from an individual and merely requires that the request be supported by an objective, credible reason, not necessarily indicative of criminality" (id. at 498; see People v De Bour, 40 NY2d at 223). The second level, referred to as the "common-law right of inquiry, permits a somewhat greater intrusion and requires a founded suspicion that criminal activity is afoot" (People v Moore, 6 NY3d at 498; see People v De Bour, 40 NY2d at 223). The third level "authorizes an officer to forcibly stop and detain an individual, and requires a reasonable suspicion that the particular individual was involved in a felony or misdemeanor" (People v Moore, 6 NY3d at 498-499; see People v De Bour, 40 NY2d at 223). Reasonable suspicion has been defined as "that quantum of knowledge sufficient to induce an ordinarily prudent and cautious person under the circumstances to believe criminal activity is at hand" (People v Martinez, 80 NY2d 444, 448 [alterations and internal quotation marks omitted]). The fourth and final level, an arrest, "requires probable cause to believe that the person to be arrested has committed a crime" (People v Moore, 6 NY3d at 499, see People v De Bour, 40 NY2d at 223). "Probable cause does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief that an offense has been [committed] or is being committed or that evidence of a crime may be found in a certain place" (People v Bigelow, 66 NY2d 417, 423). Police officers cannot make an arrest in search of a crime; rather, probable cause to believe that a crime has been committed must exist prior to an arrest.
Here, Detective Petrucci did not have probable cause to reasonably believe that the defendant was committing, or had committed, a crime, at any point prior to the defendant's arrest (see id.). Detective Petrucci testified that he arrested the defendant on the basis of the defendant's purported commission of loitering in the first degree, which is defined as "loiter[ing] or remain[ing] in any place with one or more persons for the purpose of unlawfully using or possessing a controlled substance" (Penal Law § 240.36). However, there was no testimony at the suppression hearing that the defendant had "remained" in any place with the other individuals with whom he interacted. The interactions between the defendant and the other individuals were described at the hearing as "quick," "fluid," and lasting approximately one minute.
Nor did Detective Petrucci testify to any observations which might support a reasonable belief that the defendant was present at 123 Patchogue Avenue for the purpose of unlawfully using or possessing a controlled substance, or that a narcotics offense had otherwise occurred. "Various factors, when combined with the street exchange of a telltale sign of narcotics, may give rise to probable cause [to believe] that a narcotics offense has occurred. Those factors relevant to assessing probable cause include the exchange of currency; whether the particular community has a high incidence of drug trafficking; the police officer's experience and training in drug investigations; and any additional evidence of furtive or evasive behavior on the part of the participants" (People v Williams, 69 AD3d 663, 664 [internal quotation marks omitted]; see People [*4]v Jones, 90 NY2d 835, 837). While the Court of Appeals recognized in People v Jones that a "telltale sign" of narcotics, such as a glassine envelope, is not "an indispensable prerequisite to probable cause" (People v Jones, 90 NY2d at 837), there must nevertheless be some handling of physical property or exchange of currency in a manner which to the trained observer is indicative of a drug transaction (see id.; People v McRay, 51 NY2d 594, 603-604; People v Quarless, 123 AD3d 1060; People v Blinker, 80 AD3d 619; People v Williams, 69 AD3d 663, 664; People v DiMatteo, 62 AD3d 418). Here, Detective Petrucci did not observe any physical property or currency being handled by the defendant or exchanged between the defendant and either Flores or Mugaburu prior to approaching the defendant, and did not otherwise recover any drugs or currency from the defendant, Flores, or Mugaburu prior to the defendant's arrest. Contrary to the People's contention, the observations that Detective Petrucci did make—several brief, nondescript interactions involving the defendant at an address known to the police for past drug activity—were not a sufficient basis for Detective Petrucci to form a reasonable belief that a narcotics offense was occurring or had been committed. Thus, Detective Petrucci did not have probable cause to arrest the defendant (cf. People v Jones, 90 NY2d at 837; People v Quarless, 123 AD3d 1060; People v Blinker, 80 AD3d 619; People v Williams, 69 AD3d at 664; People v DiMatteo, 62 AD3d 418).
Accordingly, the physical evidence seized and the statements made by the defendant should have been suppressed. In light of our determination, we do not reach the defendant's remaining contentions.
BARROS, J.P., CHAMBERS, ZAYAS and DOWLING, JJ., concur.
ENTER:
Maria T. Fasulo
Clerk of the Court