Fuchsberg, J.
(dissenting). The circumstances here fell far short of the narrowly circumscribed ones which would have permitted either the initial stop or the ultimate search and seizure of the defendant.
The majority concedes, as indeed it must, that it was perfectly lawful for the defendant to patronize the novelty store in order to purchase a holster. For no law forbids or regulates its sale. It also is not, and cannot be, denied that the item might just as well have been bought as a gift, as a housing for a toy gun or as a container for one of the nearly three quarters of a million handguns whose possession is licensed in New York State (see Annual Report of New York State Police Department [Jan. 31, 1980]). Nor is it as much as suggested that defendant’s conduct in buying and carrying one from the store was in any sense furtive or clandestine.
Yet, on these facts the court is willing to condone what I would have thought was a patently unjustified infringement on a person’s freedom to move about in public without police interference. In this I cannot concur.
We need look no further than the Supreme Court’s recent decision in Brown v Texas (443 US 47, 51) for the demanding *1039 principle that the police may detain an individual briefly for questioning only if they "have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity.” (Cf. Delaware v Prouse, 440 US 648.) The objective facts here, however, utterly fail to approach, much less cross, the threshold of ambiguity, and no superimposed interpretation or categorization can remedy the defect (see People v Howard, 50 NY2d 583).
As I see it, in countenancing the police confrontation with Samuels, the court is effectively announcing that anyone who purchases a holster for a not uncommon variety of gun, whether in this store or, say, Abercrombie and Fitch or Modell’s or Herman’s or any other of the numerous novelty and sporting goods shops that sell such articles in New York City, forfeits the constitutional right to be secure from unwarranted harassment. Or, for that matter, by permitting the police to cavalierly compromise the right to privacy in this fashion, the court might just as well be saying that anyone who leaves with a parcel from an establishment that carries holsters as part of its stock is open to such invasion.[1] The same could be said of the "scissors and needles, nails and knives” (Gilbert & Sullivan, Patience, Act II) and the plethora of other everyday articles that our citizens are free to buy and to own without molestation until and unless there is specific, credible reason to believe they are being put to criminal use.
The tone of life and spontaneity of spirit that characterizes a free society could not long survive if the police were allowed to exploit any unusual circumstance, rationalized with 20-20 hindsight as giving rise to suspicion, as a basis for an escalating intrusion into the privacy of anyone who insists on his right to be left alone (see, generally, Greenawalt on Reasonableness and Probable Cause, in Dorsen, The Rights of Americans, p 303 et seq.). This factor is crucial here, for without the initial baseless encounter, the officer could not conceivably claim that he was placed in a position where concern for his own safety compelled him to frisk defendant (see Terry v Ohio, 392 US 1, 27).[2]
. In this connection, it appears appropriate to note that the *1040 mushrooming lexicographical distinctions into which the reasonableness of street stops and seizures are being categorized present a disturbing problem. Since the circumstances of no two stops are ever precisely the same, the semantics necessarily employed to effect such compartmentalization, however well intended, in the end make it all the easier to substitute labels for liberties. It is encouraging therefore that such cases as Dunaway v New York (442 US 200, 213) and Brown v Texas (443 US 47, supra) appear to be leading a trend away from the artificial and "unworkable” hierarchy of police conduct erected in People v De Bour (40 NY2d 210, 222-223) (see Note, People v. De Bour: The Power of the Police to Stop and Frisk Citizens, 30 Syracuse L Rev 893).[3]
But, assuming that so much of De Bour as allows an officer to "inquire” has survived, our contemporaneous decision in People v Howard (50 NY2d 583, supra) makes the important point that one to whom an inquiry such as the one made here was directed is free to refuse to respond. Now, the privilege to do so must mean more than that the person addressed may remain mute. Howard itself, for instance, holds that the defendant there was not even obliged to stop. And, by the same token, one would expect that the individual approached would not have to, for example, hearken to a request that he loosen his clothing; remove the contents of his pockets or of the purse or parcels he may be carrying; or refrain from putting his hands in his pockets, keeping them at his sides or, let us suppose, using them to don or doff his hat, to reach into his coat for his cigarettes or to perform any one of the myriad of commonplace things a person normally is permitted to do without yielding up his constitutional right not to be searched or seized.
These observations are more than pertinent here. For it must be remembered that there is not even a claim that defendant’s pocket "bulged” (cf. De Bour, supra, at p 213), much less that it presented the outline of a gun.[4] If, therefore, *1041 only the fact that the defendant chose to put his hand in his pocket and keep it there was needed to earn him the officer’s threat "to break his head” and to subject him to the forcible removal of his hand and a search of his person,[5] for all practical purposes what the court says in Howard becomes a toothless statement that might just as well have never been written. I believe that this would be a significant impairment of the values which form an important barrier against a police State (see Brinegar v United States, 338 US 160, 176; and People v De Bour, 40 NY2d 210, 227-228 [my dissent] [discussing the balance intended to be struck by the drafters of our Constitutions]). But, since I do not view Howard as embodying such an empty intention, I also believe adherence to that decision and the Fourth Amendment requires that the fruits of the unfounded suspicion on which the police here acted should be suppressed. Concordantly, the order of the Appellate Division should be reversed and the indictment dismissed.
Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur in memorandum; Chief Judge Cooke concurs in a separate opinion; Judge Fuchsberg dissents and votes to reverse in an opinion.
Order affirmed.

. This is not a strained assumption. In this very case, the arresting officer’s testimony indicated that the police made a habit of indiscriminately confronting patrons of the store who as much as examined the holsters offered for sale.

. In his testimony, the officer himself, unlike the majority in its opinion, never characterized the defendant’s action as menacing.

. United States v Mendenhall (446 US 544), cited by the majority, does not indorse the De Bour analysis, since a majority of the court there declined to hold that the authorities could confront the defendant with questions as to her identity and business on less than "reasonable suspicion”.

. In People v Prochilo (41 NY2d 759, 763), even though the police officer was able to observe a visibly heavy object in defendant Bernard’s pocket, we ordered the gun suppressed, in part because the officer was completely unable to connect his observations with the presence of a weapon until after he had taken the impermissible step of reaching into the pocket.

. These facts derive, as they must, from the police officer’s version of the events, which was found to be credible by Trial Term. It is informative to note, however, that defendant himself testified that his right hand was in his pocket as he left the novelty store; that when the police inquired what he had purchased, he volunteered that it was a holster; that he responded in the negative to the ensuing question whether he had a gun; and that he was nonetheless patted down, two attempts being necessary before the firearm was discovered.