OPINION OF THE COURT
James P. Mulley Jr., J.
Defendant is charged with aggravated driving while intoxicated (Vehicle and Traffic Law § 1192 [2-a] [a]); two counts of *473 driving while intoxicated (Vehicle and Traffic Law § 1192 [2], [3]); harassment in the second degree (Penal Law § 240.26 [1]) and resisting arrest (Penal Law § 205.30).
The court granted defendant’s request for a probable cause hearing to determine if there was sufficient cause to stop defendant’s vehicle and place her under arrest, a Huntley hearing to determine the admissibility of statements police allegedly overheard defendant make to a member of an ambulance crew, and a hearing to determine whether defendant voluntarily consented to a blood test.
The court now makes the following findings of fact and conclusions of law.
Findings of Fact
On August 5, 2016, defendant Jaime Fenti called 911 requesting assistance because she was unable to start her car. Defendant indicated that she was driving a Volkswagen Jetta and that she was in Ellison Park, but she did not know exactly where in Ellison Park she was located.
At approximately 4:11 p.m., Monroe County Sheriffs Deputy Paolo Saieva received a “check the welfare” dispatch relaying the information defendant provided to 911. Saieva responded to one of the parking lots at Ellison Park and observed a female, later identified as defendant, backing a Volkswagen Jetta out of a parking space. Saieva turned on his lights and parked behind the vehicle as if he were initiating a traffic stop. Saieva approached and asked defendant, the sole occupant of the vehicle, if everything was okay. Defendant stated that she was okay. Saieva then asked if she needed a ride or a tow. Defendant told Saieva that she was okay and no longer needed police assistance. Saieva asked to see her license and registration. Defendant indicated she did not have the documents on her or in her vehicle.
During this initial conversation, Saieva detected the odor of alcohol emitting from defendant’s breath. He also observed that her eyes were watery, her speech slurred and her clothes disheveled.
Although not directed to do so, defendant turned the vehicle off and got out of her car. She was swaying back and forth and had difficulty standing. Saieva told her that she could not leave until she was cleared by medical personnel as she appeared to be intoxicated and unable to operate the vehicle. Defendant cursed at Saieva and told him to leave her alone.
*474 Defendant entered her vehicle and attempted to close the door while Saieva was standing in the doorframe. Defendant put the keys in the ignition and started the vehicle. Saieva reached in and turned the vehicle off. As he was doing so, defendant punched him in the right arm with a closed fist two or three times and threatened to kill him. Saieva told her she was under arrest. Defendant again directed vulgarities at Saieva and attempted to punch him. Saieva repeatedly told her to exit the vehicle. When she refused to comply, he forcibly removed her from the vehicle, placed her in handcuffs and brought her to his patrol vehicle. Defendant continued to fight, kick and use profanity as Saieva placed her in the patrol vehicle.
An ambulance arrived at the scene and a member of the crew treated defendant for minor injuries she sustained during the use of force, including a laceration to her left eye and scrapes to her left knee. Saieva heard a member of the ambulance crew ask defendant if she had consumed any alcohol. Defendant responded that she consumed a bottle of wine before driving to the park. Deputy Chris Cooper, who arrived at the scene shortly after Saieva, administered a breath test which was positive for the presence of alcohol.
Saieva arrested defendant at 4:26 p.m. for harassment and resisting arrest. He later issued tickets for driving while intoxicated. Defendant was also detained under the Mental Hygiene Law due to her high level of intoxication, threats to kill Saieva, and statements that she wanted to die because she was embarrassed that she hit a police officer.
Defendant was transported to Strong Memorial Hospital by ambulance. Hannah Griffiths, a registered nurse, triaged defendant in the Emergency Department. Griffiths observed a small cut on defendant’s forehead. Defendant was cooperative with Griffiths and gave coherent answers to all her questions. Saieva asked defendant if she would consent to the taking of a blood sample. Defendant agreed to the blood draw. Griffiths completed a consent form and presented it to defendant for her signature. Defendant signed the consent form granting permission for blood samples to be taken. Griffiths drew the blood samples from defendant at 6:15 p.m.
Conclusions of Law
“In evaluating police conduct, the court must determine whether the action taken was justified in its inception and at every subsequent stage of the encounter” (People v Brown, 148 *475 AD3d 1562, 1563 [2017], quoting People v Nicodemus, 247 AD2d 833, 835 [1998]; see People v De Bour, 40 NY2d 210, 215 [1976]).
Defendant argues that the police action was not justified at its inception, and consequently, any evidence obtained thereafter should be suppressed. Defendant contends that when the Deputy arrived in response to her 911 call, it was apparent that she had been able to start her car and was no longer in need of assistance, and therefore, police were not justified in stopping her vehicle. The court disagrees. When specific and articulable facts exist supporting an officer’s reasonable belief that a motorist needs assistance because there is something wrong with the vehicle or an occupant of the vehicle, the community caretaking exception may be applied to justify the stop of the motor vehicle.
It is well settled that the stop of an automobile by police constitutes a “seizure” for purposes of the Fourth Amendment to the United States Constitution (People v Spencer, 84 NY2d 749 [1995]; People v May, 81 NY2d 725 [1992]). Police stops of automobiles are permissible where the police have probable cause to believe that the driver of an automobile has committed a traffic violation (People v Guthrie, 25 NY3d 130 [2015]; People v Robinson, 97 NY2d 341 [2001]), or where there exists reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime (Spencer at 752, 753).[1]
Here, it is clear that the stop of defendant’s vehicle as she backed out of a parking space constituted a seizure under the Fourth Amendment. It is equally clear that at the time of the stop the Deputy did not have probable cause to believe that defendant had committed a traffic violation or have a reasonable suspicion of criminal activity. The question presented is whether the stop may be justified as a proper exercise of a police officer’s community caretaking function.
The Court of Appeals has long recognized that police officers perform public service functions unrelated to their law enforcement functions. In De Bour, the Court noted that
*476 “well over 50% of police work is spent in pursuits unrelated to crime. . . .
“Generally, in the performance of their public service functions, not related to criminal law enforcement, the police should be given wide latitude to approach individuals and request information . . . We have consistently recognized the obligation of policemen to render assistance to those in distress” (40 NY2d at 218 [citations omitted]).
The Court made clear that the four-tiered approach for evaluating the propriety of police-citizen encounters set forth in De Bour applied to police engaged in their criminal law enforcement function, not their public safety function.
The United States Supreme Court has also distinguished situations where police were acting in their law enforcement capacity from situations where police were acting in their public safety or, as termed by the Court, their “community caretak-ing” capacity. In Cady v Dombrowski (413 US 433 [1973]) defendant, an out-of-state police officer, was involved in an automobile accident and thereafter arrested for drunken driving. Defendant’s damaged vehicle was towed and later searched on the belief that the vehicle may contain defendant’s service revolver. The Court upheld the warrantless search of the impounded vehicle because it was undertaken pursuant to the officer’s “community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute” (413 US at 441).
Most cases applying the community caretaking exception address situations where police searched, towed, and impounded a vehicle that was disabled or unattended because the operator was arrested.
People v Tardi (28 NY3d 1077 [2016]) illustrates application of the community caretaking exception to the impoundment of automobiles. In Tardi, the defendant was arrested for shoplifting in a store in a Buffalo suburb. Police, acting upon the request of security, impounded the vehicle and performed an inventory search of its contents before towing it. A handgun was discovered during the inventory search. The Court upheld the search, holding that the officer’s decision to search the vehicle was consistent with the community caretaking function of the police department: “Police acting in a community caretak-ing capacity may impound an arrestee’s vehicle when the vehicle, if left unattended, risks being vandalized or stolen” (28 NY3d at 1078 [citations omitted]).
*477 The more difficult question, and the one squarely presented here, is whether the community caretaking exception may be applied to justify the stop of a moving vehicle. There are no reported cases in New York addressing this issue.
Federal courts have recognized that under the community caretaking exception a police officer may stop a moving vehicle to ensure the safety of the occupants without evidence of a traffic violation or reasonable suspicion of criminal activity. For example, in United States v Touzel (409 F Supp 2d 511 [D Vt 2006]), a trooper with the Vermont State Police stopped defendant’s car near the scene of a motor vehicle accident. The trooper warned defendant about downed power lines and offered assistance regarding alternate routes. Defendant’s peculiar behavior during the stop aroused the trooper’s suspicions and a subsequent search revealed that defendant was in possession of a controlled substance. The court concluded that the trooper’s decision to stop defendant’s vehicle to offer assistance regarding alternate routes was a valid exercise of the community caretaking function.[2]
Numerous state courts have also applied the community caretaking exception to justify the stop of a moving vehicle. In State v Rohde (22 Neb App 926, 864 NW2d 704 [2015]), police stopped a moving vehicle after observing a female passenger with her head and part of her torso sticking out of the moon-roof of the vehicle. The woman was waving her arms. The Nebraska Court of Appeals held that the stop was justified under the community caretaking exception because the officer could reasonably conclude that the passenger was attempting to flag him down to obtain his assistance.
State v Organ (225 Ariz 43, 234 P3d 611 [2010]) is also instructive. There, police observed defendant’s vehicle stopped by the side of the road with its emergency flashers activated. The motorist deactivated the emergency flashers and moved slowly along the shoulder of the road. The Arizona Court of Appeals affirmed the trial court’s denial of defendant’s motion to suppress the contraband subsequently seized. Even though the *478 vehicle was moving and the emergency flashers deactivated, it was reasonable for the officer to believe that defendant had a continuing problem and may have needed help.
Similarly, in Crauthers v State (727 P2d 9 [Alaska Ct App 1986]), police observed a motorist slow down and roll down his window. The officer, believing the motorist needed directions or help, activated his emergency lights and pulled the vehicle over. During the interaction that followed, police detected indicia of intoxication. Citing Cady, the Alaska Court of Appeals concluded that the stop was proper, holding, “When a police officer observes facts and circumstances which he actually and reasonably concludes to be a request for contact or assistance, the officer is justified in making that contact” (727 P2d at 11).[3]
A review of federal and state cases that have applied the community caretaking exception to the stop of a moving vehicle reveals that the appropriate standard is one of reasonableness. The standard is firmly rooted in Fourth Amendment jurisprudence which recognizes that the Fourth Amendment is not a guarantee against all seizures, but only against unreasonable seizures (United States v Sharpe, 470 US 675 [1985]). To justify the stop of a vehicle under the community caretaking exception, the officer must be able to point to specific and ar-ticulable facts which support a finding that the officer reasonably concluded that the motorist was in need of assistance.
Application of this standard to the case at bar demonstrates that the stop of defendant’s vehicle was a proper exercise of the community caretaking exception.
It is, of course, significant that defendant initiated the contact by calling 911 for assistance. A police officer is entitled, and in fact duty bound, to take action on a radio call (People v Benjamin, 51 NY2d 267 [1980]). Indeed, the officer could be considered derelict in his duties had he responded to a check the welfare call without checking the welfare of the caller.
*479 The fact that the vehicle was moving when Saieva arrived did not eliminate the need to check the welfare of the driver. As in State v Organ, it was reasonable for the Deputy to believe that defendant had a continuing problem and that his help was not only needed, but would be welcomed. This is especially true in light of the fact that Saieva was aware that defendant told the 911 operator that she didn’t know where within the park she was located, suggesting that she was unfamiliar with the area. That information reasonably leads to an inference that, in addition to having mechanical problems with her vehicle, defendant may have been lost. The fact that she may have been lost is entitled to some, albeit slight, weight (see United States v Dunbar, 470 F Supp 704 [D Conn 1979], affd 610 F2d 807 [2d Cir 1979]).
The questions posed by the Deputy also suggest that he was performing a community caretaking function. His initial question was, “Are you okay?” He then asked, “Do you need a ride or a tow?” These questions demonstrate a genuine concern for the welfare of the driver. The subsequent request to produce her license and registration does not require a different result; once police lawfully stop a motorist they may require production of his or her license and registration (People v Graham, 54 AD3d 1056 [2d Dept 2008]; People v Leiva, 33 AD3d 1021 [2d Dept 2006]; see also People v Thomas, 19 AD3d 32 [1st Dept 2005]).
In view of the above, the court concludes that the initial stop of the vehicle was justified under the community caretaking function.
After the lawful stop, Saieva developed probable cause to arrest defendant. Since defendant subjected Saieva to physical contact by striking him, he had probable cause to arrest her for harassment (People v Jackson, 251 AD2d 820 [3d Dept 1998]). He also had probable cause to arrest defendant for a violation of Vehicle and Traffic Law § 1192. In People v Vandover (20 NY3d 235 [2012]), the Court set forth the probable cause standard as it applies to drinking and driving offenses: an arrest for driving while intoxicated is based on probable cause if the arresting officer has evidence that it is “more probable than not that defendant is actually impaired” (20 NY3d at 239). Here, during his initial interaction with defendant, Saieva detected an odor of alcohol on defendant’s breath and noted that defendant’s eyes were watery, her speech slurred and her clothing disheveled. When defendant exited the vehicle she *480 was unsteady on her feet. When she reentered her vehicle, she was verbally and physically abusive to the Deputy. These observations support a finding of probable cause that defendant committed a violation of Vehicle and Traffic Law § 1192 (see People v Hogue, 136 AD3d 1351 [4th Dept 2016]; People v Tieman, 112 AD3d 975 [2d Dept 2013]; People v O’Brien, 140 AD3d 1325 [3d Dept 2016]).
The court also rejects defendant’s request to suppress the statements she made to a member of the ambulance crew that were overheard by Saieva. While defendant was being treated, Saieva overheard a member of the ambulance crew ask her if she had consumed any alcohol. Defendant answered that she had consumed a bottle of wine before operating her vehicle. An admission to a private individual overheard by police which was not induced, provoked or encouraged by the police is admissible (People v Jones, 169 AD2d 986 [3d Dept 1991]; People v Jesus, 15 Misc 3d 1111 [Sup Ct, Kings County 2007]).
Finally, the court concludes that the blood test results are admissible. To be admissible, the People are required to prove that defendant consented to the taking of the blood sample (People v Verdile, 119 AD2d 891 [3d Dept 1986]). The evidence adduced at the hearing demonstrates that defendant knowingly and voluntarily consented to the blood draw. The injuries defendant sustained during her altercation with Saieva were minor. Although combative at the time of her arrest, Griffiths credibly testified that when defendant arrived at the hospital she was cooperative, alert and oriented. Defendant signed the consent form granting permission for blood samples to be taken. The court is satisfied that the People met their heavy burden of proving the voluntariness of the consent (see People v Mojica, 62 AD3d 100 [2d Dept 2009]).
For the reasons stated above, defendant’s motion to suppress is denied in all respects.

. The instant case involves the stop of a moving vehicle. The New York Court of Appeals has made it clear that the right to stop a moving vehicle is distinct from the right to stop a pedestrian (People v De Bour, 40 NY2d 210 [1976]), the right to approach occupants of a parked vehicle (People v Harrison, 57 NY2d 470 [1982]), or the right to approach occupants of a vehicle that is stopped, but not parked (People v Ocasio, 85 NY2d 982 [1995]).

. See also United States v Brown, 447 Fed Appx 706 (6th Cir 2012) (the community caretaking function of locating missing children would permit police to stop a vehicle when prompt inquiry of the occupant may assist in finding the child); United States v King, 990 F2d 1552 (10th Cir 1993) (officer properly exercised community caretaking function when she stopped a vehicle near an accident scene to advise a motorist trying to get through the intersection to stop honking his horn because it was creating a hazard).

. See also State v Chisholm (39 Wash App 864, 696 P2d 41 [1985]), where the Washington Court of Appeals concluded that the community caretaking exception allowed a police officer to stop a vehicle and warn the motorist that his property was in jeopardy of blowing out of the bed of his pickup truck, and People v Mains (2012 Ill App [2d] 110262, 969 NE2d 926 [2012]), where the Appellate Court of Illinois concluded that the community caretaking exception allowed a police officer to stop a vehicle to determine if the motorist needed assistance where the motorist was driving a malfunctioning vehicle at a slow rate of speed with hazard lights flashing.