People v Brown (2024 NY Slip Op 02765)

People v Brown

2024 NY Slip Op 02765 [42 NY3d 270]

May 21, 2024

Troutman, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, November 6, 2024

[*1]

The People of the State of New York, Respondent,
v
Jason Brown, Appellant.

Argued April 17, 2024; decided May 21, 2024

People v Brown, 79 Misc 3d 127(A), 2023 NY Slip Op 50645(U), reversed.

{**42 NY3d at 272} OPINION OF THE COURT

Troutman, J.

We are asked to decide whether the police lawfully stopped defendant's vehicle while acting in their role of assisting those in need of aid. Although we recognize a "community caretaking" function pursuant to which, in certain circumstances, police may stop a moving vehicle, we nevertheless conclude that under the circumstances here, the stop of defendant's vehicle was unlawful.
I.
In May of 2017, police officers stopped a vehicle driven by defendant. When the officers approached the car, they smelled marijuana, and they asked defendant to exit the vehicle. Thereafter, defendant admitted to possession of ecstasy. Defendant was charged with criminal possession of a controlled substance in the seventh degree. He moved to suppress his statement and the physical evidence recovered.
During the suppression hearing, Police Officer Harris Haskovic testified that while he and his partner were traveling in an unmarked vehicle, he observed the passenger side door of the vehicle in front of them open and close "quickly" and "forcefully" while the car was in motion. Haskovic thought this was "strange" and believed that it was possible that "somebody needed some sort of aid." He then pulled the vehicle over.
Officer Haskovic and his partner approached the vehicle. Upon doing so, Haskovic noticed an odor of marijuana coming from the vehicle. Haskovic asked defendant, who was driving, for his license and registration, [*2]observing that defendant appeared{**42 NY3d at 273} "very nervous." Two passengers were inside the vehicle: one in the front passenger seat and another in the rear seat. Haskovic asked defendant to step out of the vehicle and if he had "anything on him." Defendant said he had "some E, called it his party drug." Defendant was arrested, after which marijuana and more ecstasy were found in the car.
Haskovic estimated that defendant's vehicle was traveling 20 or 25 miles per hour when the front passenger door opened and closed, which was not above the speed limit. Haskovic could not observe anything happening inside the car, he did not hear any screaming or calls for help, and he conceded that he did not observe the vehicle commit any traffic infractions that could have provided probable cause for the stop.
After the suppression hearing, the People argued that Haskovic's stop of the vehicle was justified by his observation of the door opening and closing while the car was in motion, which led to his reasonable concern that someone in the vehicle needed assistance. The suppression court agreed. The court concluded that at the time of the stop, defendant had not committed a traffic infraction, nor did police have reasonable suspicion of criminal activity. The court held, however, that it was reasonable for Haskovic to be concerned for the safety of the passenger after he saw the vehicle door open and close while the vehicle was in motion, and this safety concern justified the stop.[FN1] Defendant thereafter pleaded guilty to disorderly conduct.
On appeal, the Appellate Term affirmed the judgment, holding that "the stop of the vehicle was justified based on considerations of public safety" (79 Misc 3d 127[A], 2023 NY Slip Op 50645[U],{**42 NY3d at 1} *1 [App Term, 1st Dept 2023]). A Judge of this Court granted defendant leave to appeal (40 NY3d 996 [2023]). We now reverse.
II.
A.
The parties here agree that police may act in an exercise of their "community caretaking" duty to assist people in need, and that the community caretaking doctrine allows police to stop a moving vehicle. The parties also largely—though not {**42 NY3d at 274}entirely—agree on the standard we should adopt for this community caretaking doctrine. They urge this Court for the most part to adopt the standard articulated by the Pennsylvania Supreme Court in Commonwealth v Livingstone (644 Pa 27, 174 A3d 609 [2017]).
We have not yet considered whether the community caretaking doctrine permits the stop of a vehicle. This Court has long recognized, however, that the "role of the police in our society is a multifaceted one" and that the police have an "obligation . . . to render assistance to those in distress" (People v De Bour, 40 NY2d 210, 218 [1976]). When considering the issue of whether an emergency justified a warrantless entry into a residence, we have stated that the police "are required to serve the community in innumerable ways, from pursuing criminals to rescuing treed cats" (People v Molnar, 98 NY2d 328, 331 [2002]; see also People v Gallmon, 19 NY2d 389, 394 [1967]).[FN2] And we have acknowledged that the police may impound a car "when necessary to protect public safety" pursuant to their community caretaking role (People v Hinshaw, 35 NY3d 427, 438 [2020]; see also People v Tardi, 28 NY3d 1077, 1078 [2016]). Other New York courts have also considered whether police stops of automobiles based on public safety concerns were lawful (see e.g. People v Scottborgh, 71 Misc 3d 131[A], 2021 NY Slip Op 50316[U], *2-3 [App Term, 2d Dept, 9th & 10th Jud Dists 2021], citing People v Fenti, 57 Misc 3d 471 [Penfield Just Ct 2017], and People v Del Rio, 61 Misc 3d 944 [Middletown City Court 2018]).
Many other state high courts have recognized a community caretaking doctrine, sometimes phrased as a "public safety" or "public servant" doctrine, that allows police intrusion based on a reasonable belief that someone is in need of aid (see e.g. State v Short Bull, 2019 SD 28, ¶¶ 11-21, 928 NW2d 473, 476-478 [2019]; Byram v State, 510 SW3d 918, 922-925 [Tex Crim App 2017]; State v Scriven, 226 NJ 20, 38-40, 140 A3d 535, 545-546 [2016]; State v McCormick, 494 SW3d 673, 686-688 [Tenn 2016]; State v Anderson, 2015 UT 90, ¶¶ 25-30, 362 P3d 1232, 1239-1240 [Utah 2015]; State v Hinton, 198 Vt 167, 170-173, 112 A3d 770, 773-775 [2014]; State v Kurth, 813 NW2d 270, 277-279 [Iowa 2012];{**42 NY3d at 275} Trejo v State, 2008-CT-02133-SCT, ¶¶ 14-18, 76 So 3d 684, 689-690 [Miss 2011]; People v McDonough, 239 Ill 2d 260, 268-272, [*3]940 NE2d 1100, 1107-1109 [2010]; State v Kramer, 315 Wis 2d 414, 425-440, 759 NW2d 598, 604-612 [Wis 2009]; Williams v State, 962 A2d 210, 216-222 [Del 2008]; State v Bakewell, 273 Neb 372, 375-377, 730 NW2d 335, 338 [2007]; State v Rincon, 122 Nev 1170, 1175-1176, 147 P3d 233, 237 [2006]; State v Acrey, 148 Wash 2d 738, 748-751, 64 P3d 594, 599-600 [2003]; State v Boyle, 148 NH 306, 307-309, 807 A2d 1234, 1236-1237 [2002]; State v Lovegren, 310 Mont 358, 363-367, 51 P3d 471, 473-476 [2002]; see also Livingstone, 644 Pa at 58-69, 174 A3d at 627-634 [collecting and discussing cases]). The impetus for allowing the police to act in such scenarios is a recognition that police are often called to render assistance outside of their criminal investigation role and that police officers should be encouraged to render aid to citizens in distress (see Livingstone, 644 Pa at 60-61, 174 A3d at 628-629).
The United States Supreme Court has also recognized community caretaking as a valid function of the police, albeit in a more limited context than earlier cases from other jurisdictions might suggest. The Supreme Court has stated that "[b]ecause of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways," police officers often engage in "community caretaking functions" with respect to automobiles, "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" (Cady v Dombrowski, 413 US 433, 441 [1973]). Cady held that the warrantless police search of an impounded vehicle was lawful (see id. at 442-448).
Recently, the Supreme Court clarified that Cady and the community caretaking doctrine has no application to warrantless searches and seizures inside the home (see Caniglia v Strom, 593 US 194 [2021]). Although emergencies and exigent circumstances may justify warrantless entry into the home, the Court held that the community caretaking doctrine does not (see id. at 197-199). The Court reasoned that its opinion in Cady emphasized the distinction between homes and vehicles, and the Court observed that Cady's "recognition that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere" (id. at 199). The Court concluded that "[w]hat is reasonable for vehicles is different from what is reasonable for homes" (id.).
{**42 NY3d at 276}In the wake of Caniglia and its focus on the home, one of the federal Circuit Courts of Appeal to address the question concluded that Caniglia has no impact on the community caretaking doctrine as applied to vehicles (see United States v Treisman, 71 F4th 225, 232 [4th Cir 2023]; see also e.g. Taylor v State, 326 So 3d 115, 117 n 1 [Fla Dist Ct App 2021]; Comment, Caniglia v Strom, 135 Harvard L Rev 371, 375-376 [2021] ["The Court's doctrinal answer to the community caretaking exception's scope was relatively unremarkable: it resolved a circuit split in favor of precedent that acknowledges the special status of private homes in Fourth Amendment jurisprudence"]). Others have concluded that Caniglia should serve as a reminder that the community caretaking doctrine cannot be used to "overrun core Fourth Amendment protections" and "permits only the use of evidence duly discovered in the course of advancing the caretaking function at hand" (United States v Morgan, 71 F4th 540, 545 [6th Cir 2023]). "Community-caretaking actions, in short, are permitted when reasonable but only when reasonable" (id. at 546).
B.
In light of our previous recognition that police officers are often called upon to provide "historically grounded, and usually welcome" aid to those in distress (see id. at 545), we, like many other state high courts, recognize a community caretaking doctrine that may allow police to stop a moving vehicle. We nevertheless acknowledge, as many of our sister courts have, the risk that the community caretaking doctrine may be used by police to circumvent the federal and state constitutional rights afforded to citizens to protect them from unreasonable and unwarranted police intrusions (see id. [care must be taken "not to allow this historically grounded, and usually welcome, explanation for police work to overrun core Fourth Amendment protections"]). The standard we adopt for community caretaking in this context must weigh both of those concerns.
[1] We conclude that the police may stop an automobile in an exercise of their community caretaking function if two criteria exist. First, the officers must point to specific, objective, and articulable facts that would lead a reasonable officer to conclude that an occupant of the vehicle is in need of assistance. Second, the police intrusion must be narrowly tailored to address the perceived need for assistance. Once assistance has been provided and the peril mitigated, or the perceived{**42 NY3d at 277} need for assistance has been dispelled, any further police action must be justified under the Fourth Amendment and article I, § 12 of the State Constitution.
With respect to the first prong, we agree with both parties and the Livingstone court that "a critical component of the community caretaking doctrine is that the police officer's action be based on specific and articulable facts which, viewed objectively and independent of any law enforcement concerns, would suggest to a reasonable officer [*4]that assistance is needed" (Livingstone, 644 Pa at 72, 174 A3d at 636). An officer's conclusory testimony that the stop was motivated solely by concern for the occupants, standing alone, cannot satisfy the first prong. There must be an objective basis to support the officer's claimed belief.[FN3]
We disagree with defendant, however, that "an officer's contemporaneous subjective concerns regarding criminal activity will preclude a finding that a seizure is valid under the community caretaking function" (id.), for two reasons. First, our overall search and seizure jurisprudence generally assesses the constitutionality of police action based on the objective standard of reasonableness, acknowledging the "difficulty, if not futility, of basing the constitutional validity of searches or seizures on judicial determinations of the subjective motivation of police officers" (People v Garvin, 30 NY3d 174, 186 [2017] [internal quotation marks omitted]).
Second, a vehicle occupant may require assistance because of criminal activity, and a police officer may consider that as one possible cause of the need for assistance. We should not deter police officers from acting in such circumstances. As the Wisconsin Supreme Court adeptly explained:
"In regard to our community caretaker analysis, the nature of a police officer's work is multifaceted.{**42 NY3d at 278} An officer is charged with enforcing the law, but he or she also serves as a necessary community caretaker when the officer discovers a member of the public who is in need of assistance. As an officer goes about his or her duties, an officer cannot always ascertain which hat the officer will wear—his law enforcement hat or her community caretaker hat. For example, an officer may come upon what appears to be a stalled vehicle and decide to investigate to determine if assistance is needed; however, the investigation may show that a crime is being committed within the vehicle. Therefore, from the point of view of the officer, he or she must be prepared for either eventuality as the vehicle is approached. Accordingly, the officer may have law enforcement concerns, even when the officer has an objectively reasonable basis for performing a community caretaker function." (Kramer, 315 Wis 2d at 433-434, 759 NW2d at 608).
To provide another example, in Byram, a police officer saw a passenger slumped over and unconscious inside a vehicle, and the driver did not respond to audible inquiries regarding the passenger's well-being before driving away (see Byram, 510 SW3d at 920). The court observed that the officer might have reasonably suspected that the passenger was dangerously intoxicated, experiencing a medical emergency, or perhaps being transported somewhere by the driver without her knowledge and against her will (see id. at 924-925). Although only the last possibility would suggest criminality, the officer was not prohibited from stopping the moving vehicle to check on the passenger's condition simply because that possibility might have entered the officer's mind.
We therefore agree with the Livingstone court that "so long as a police officer is able to point to specific, objective, and articulable facts which, standing alone, reasonably would suggest that . . . assistance is necessary, a coinciding subjective law enforcement concern by the officer will not negate the validity of that [officer's actions] under the . . . community caretaking doctrine" (Livingstone, 644 Pa at 74, 174 A3d at 637). In other words, "[t]he circumstances should . . . make clear that the police would have been wholly justified in pursuing the community [*5]caretaking end even in the absence of a law enforcement objective" (Debra Livingston, Police, Community Caretaking, {**42 NY3d at 279}and the Fourth Amendment, 1998 U Chi Legal Forum [Issue 1] 261, 303 [1998]).
With respect to the second prong—that the police intrusion must be narrowly tailored to address the perceived need for assistance—the suppression court should consider whether the police intrusion "reasonably match[es] the problem at hand" or if there are less intrusive alternatives for addressing the concern (Morgan, 71 F4th at 545-546). In other words, "the level of intrusion must be commensurate with the perceived need for assistance" (Livingstone, 644 Pa at 74, 174 A3d at 637). Once " 'the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure' " implicating the Fourth Amendment and article I, § 12 of the State Constitution (Livingstone, 644 Pa at 74-75, 174 A3d at 637, quoting Lovegren, 310 Mont at 366, 51 P3d at 476).
Thus, if a vehicle stop is justified based on specific, objective, and articulable facts that would lead a reasonable officer to conclude that an occupant of the vehicle is in need of assistance, but the officers thereafter determine that no aid is needed, any further police action must be evaluated under the framework applicable to officers acting "in their criminal law enforcement capacity" (see generally People v Hollman, 79 NY2d 181, 184-185 [1992]). For an automobile stop, this means that any continuation of the stop beyond what is necessary to ascertain whether an occupant needs aid requires at least reasonable suspicion of criminal activity (see Rodriguez v United States, 575 US 348, 350, 354-355 [2015]; People v Banks, 85 NY2d 558, 562 [1995]). "[C]ommunity caretaking permits only the use of evidence duly discovered in the course of advancing the caretaking function at hand" (Morgan, 71 F4th at 545).[FN4] Further police intrusion must be constitutionally justified.
{**42 NY3d at 280}We respectfully disagree with our concurring colleagues that we "needlessly" opine on the community caretaking doctrine. Although the lower courts did not use the phrase "community caretaking," they both held that the stop of defendant's vehicle was justified based on concerns of public safety (see 2023 NY Slip Op 50645[U], *1), and both parties on this appeal expressly ask the Court to consider the community caretaking doctrine and provide guidance on its parameters. As noted above, other New York courts have considered stops of moving vehicles based on community caretaking (see Scottborgh, 2021 NY Slip Op 50316[U], *2; Del Rio, 61 Misc 3d at 951; Fenti, 57 Misc 3d at 475-480). Whether phrased as a "public servant," "public safety," or "community caretaking" doctrine, courts in this state and many others have considered and will continue to consider if police may stop moving vehicles based on safety concerns. If we were to ignore the parties' arguments on this appeal, we would be abdicating our role as the State's highest court to provide needed guidance to lower courts on how they should assess police conduct in these circumstances. To hold that the stop violated defendant's constitutional rights, without explaining why, would engender confusion and would leave police and lower courts to supply their own standards as to whether the stop was lawful. Avoiding the issue would not prevent lower courts from assessing whether public safety concerns justified an automobile stop, but rather would simply leave them without a clear standard to render that decision.
The concurrence suggests that no recognition of the community caretaking doctrine is necessary because the police already have the authority to respond to "true emergencies" (concurring op at 
288). The emergency doctrine, however, allows police to act only to "assist persons who are seriously injured or threatened with such injury" (Brigham City v Stuart, 547 US 398, 403 [2006]; see Caniglia, 593 US at 198; Molnar, 98 NY2d at 332 ["(T)he police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property" (internal quotation marks omitted)]). The community caretaking doctrine, by contrast, "also encompasses far less time-sensitive concerns where neither persons nor property would be [*6]placed in substantial jeopardy by failing to act immediately" (Michael R. Dimino, Sr., Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness, 66 Wash & Lee L Rev 1485, 1506 [2009]), and "the {**42 NY3d at 281}distress exhibited by the individual need not suggest harm dire enough to trigger the emergency aid doctrine" (Byram, 510 SW3d at 923). For example, the community caretaking doctrine has been held to justify the stop of a moving vehicle where a passenger appears unconscious and possibly in need of medical assistance but not necessarily in imminent danger (see id. at 924-925); where police stop motorists to warn of a downed tree (see Hinton, 198 Vt at 173, 112 A3d at 775); and where a passenger appears to be flagging the police officer for assistance (see State v Rohde, 22 Neb App 926, 942-943, 864 NW2d 704, 715 [2015]).
We recognize, however, that the community caretaking doctrine is subject to abuse, and we caution that suppression courts should carefully scrutinize automobile stops where community caretaking is proffered as the justification in order to prevent abuse of the doctrine (see McCormick, 494 SW3d at 688 ["(W)hen the community caretaking exception is invoked to validate a search or seizure, courts must meticulously consider the facts and carefully apply the exception in a manner that mitigates the risk of abuse"]). The community caretaking doctrine may be used to justify an automobile stop even when there is no probable cause to believe that the driver has committed a traffic infraction and no reasonable suspicion that the occupants have committed, are committing, or are about to commit a crime (see Hinshaw, 35 NY3d at 430) only when the test for the community caretaking doctrine set forth above is satisfied. We expect that such cases will be rare.
C.
[2] Here, the stop of defendant's vehicle was not justified under the first prong of the community caretaking doctrine because Haskovic's testimony did not establish specific, objective, and articulable facts that would lead a reasonable officer to conclude that an occupant of the vehicle was in need of assistance. The sole basis for Haskovic's belief that an occupant of the vehicle might need aid was his observation of the front passenger door opening and closing while the vehicle was in motion. As discussed, he testified during the suppression hearing that he did not see or hear anything else that indicated someone was in distress, nor did the door repeatedly open and close or remain open for an extended period of time, which might have suggested that there was a safety or equipment problem.{**42 NY3d at 282}
The observation of the car door opening and closing once while the vehicle was in motion, standing alone, would not lead a reasonable officer to conclude that an occupant of the vehicle was in need of aid. As defendant points out, there are many innocuous reasons why a car door might open and close while a vehicle is in motion, including that a car sensor is alerting an occupant that the door is not fully closed, a seatbelt or item of clothing is stuck in the door, or the occupant is attempting to free an insect inside the vehicle (see Livingstone, 644 Pa at 70, 174 A3d at 634-635 [discussing innocuous reasons why a motorist might pull to the side of a highway]). Haskovic articulated specific facts but not ones which would have led a reasonable officer to believe that an occupant of the vehicle needed assistance. Whatever concern the officer had about the door opening, it did not justify pulling the vehicle over.
Because Haskovic did not articulate specific and objective circumstances that would reasonably suggest that an occupant of the vehicle needed aid, the first prong of the community caretaking doctrine is not satisfied. We therefore have no reason to consider the scope of the police interaction under the second prong of the analysis.
Accordingly, the order of the Appellate Term should be reversed and the accusatory instrument dismissed.

Rivera, J. (concurring).
Defendant Jason Brown was driving within the speed limit on a New York City street when a police officer pulled him over after observing the front passenger door quickly open and shut. Nothing unusual about that. Occupants of motor vehicles commonly open and close car doors quickly and may do so even when a car is in motion—for instance, if the door is not properly locked or an item of clothing or a seat belt is caught in the door. This innocuous conduct does not even hint at criminality. Therefore, I agree with the majority that, on these facts, the police had no lawful basis for an investigatory stop of defendant's vehicle. That is all we need say. However, the majority goes further and needlessly opines on the "community caretaking doctrine" where the lower courts made no mention of such doctrine. More troubling, the majority adopts a new standard which is unnecessary to resolve the appeal because by any measure, the officers' conduct was not objectively reasonable. Traditional notions of judicial restraint counsel against the majority's exposition. I therefore concur only in the result.{**42 NY3d at 283}
* * *
Defendant moved to suppress his statements and the drugs recovered from his person and the car after the vehicular stop. At the first suppression hearing, Officer Haskovic testified that he and his partner were traveling in an unmarked car when he noticed defendant driving a vehicle about 25 miles per hour, one car length ahead. As defendant's car approached an intersection, Officer Haskovic observed the front passenger door "swing[ ] open and then quickly shut[ ]." The officer testified that the opening and closing of the door was not a traffic violation. Nor did he observe the driver engage in speeding, "undue swerving" or reckless driving. The officer further testified that he did not hear any screams or see any smoke coming from the car and, before the stop, he had no other information regarding the car or the driver.
Nevertheless, the officer pulled over defendant based solely on the opening and closing of the door, which the officer described as "strange" and which led him to believe that "possibly somebody . . . needed some sort of aid or something was going on in that vehicle." The officer and his partner approached the vehicle from opposite sides, at which point Officer Haskovic noticed a woman sitting in the front passenger seat and another man sitting in the rear passenger-side seat. Neither officer asked if anyone was in distress, nor did Officer Haskovic observe any conduct to suggest that someone needed assistance. Instead, Officer Haskovic asked defendant where he was going, and followed up with a request for defendant's license and registration. According to Officer Haskovic, at this point, he noticed a smell of marijuana emanating from the car. He then ordered defendant to step out of the car, elicited an admission from defendant that he had drugs in his pocket, recovered ecstasy from defendant's person and other drugs from inside the car, and arrested all of the car's occupants.
The court denied defendant's motion to suppress, concluding that "[i]t was reasonable for the officer to be concerned for the passenger's safety and this safety concern outweighs the interference [with] the defendant's liberty." On defendant's motion, the court reopened the suppression hearing, and defendant questioned Officer Haskovic regarding a previously-undisclosed 9-1-1 call regarding an individual in the vicinity where defendant was stopped who was cited as the possible perpetrator of a previous assault. Officer Haskovic testified that he did not hear the radio run and did not stop defendant{**42 NY3d at 284} on that basis. He testified, as he did at the initial hearing, that he conducted the stop "to inquire for safety." The court denied defendant's renewed motion to suppress, concluding that the "radio run dealt with somebody who was on foot, a couple of blocks away," that the officer credibly testified that the stop was unrelated to it, and that the officer's concern that somebody might have needed help rendered the stop reasonable. That was error.
On appeal, the Appellate Term rejected defendant's challenge to the denial of his suppression motion, concluding that "the stop of the vehicle was justified based on considerations of public safety, even where an 'actual violation of the Vehicle and Traffic Law [is] not . . . detectable' and this safety concern outweighs the interference of defendant's liberty" (79 Misc 3d 127[A], 2023 NY Slip Op 50645[U], *1 [App Term 1st Dept 2023] [citation omitted], quoting People v Ingle, 36 NY2d 413, 420 [1975]). This too was error.
[*7]
As we recently stated in People v Hinshaw, a vehicular stop is a seizure for Fourth Amendment purposes and requires probable cause of a traffic violation or reasonable suspicion that the driver or occupants have committed, are committing or about to commit a crime, or that the stop is conducted pursuant to uniform traffic procedures (see 35 NY3d 427, 430 [2020]). Here, Officer Haskovic did not base his stop of defendant's car on any of these three grounds and the prosecution makes no such claim. However, the prosecution asserts—and the courts below determined—that there was a public safety basis for the stop. The majority and I agree that the stop was not justified based on any suggestion that a traffic violation or crime were afoot.
Here, the mere onetime, quick opening and closing of the passenger side door did not provide a basis to stop defendant's vehicle under any recognized Fourth Amendment standard. The officer's observations did not support "probable cause that [the] driver . . . committed a traffic violation" or "reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime" (Hinshaw, 35 NY3d at 430). And the door swinging open and closed on a slow-moving vehicle is not so odd or uncommon as to indicate that someone in the car needed help, unrelated to a crime-in-progress. Some of the more obvious and innocent reasons for quickly opening and closing a car door are to remove a stuck seat belt, article of clothing, or bag, or because the door is ajar. As these examples illustrate, far from suggesting{**42 NY3d at 285} nefarious conduct or danger, opening and closing a car door may ultimately prevent injury to the car's occupants (see 
majority op at 281-282; see also Insurance Institute for Highway Safety & Highway Loss Data Institute, Fatality Facts 2021: Yearly Snapshot [May 2023], available at 
https://www.iihs.org/topics/fatality-statistics/detail/yearly-snapshot#seat-belt-use [observing that, according to data from the U.S. Department of Transportation, 45% of drivers and 45% of passengers killed in car accidents in 2021 were unbelted] [last accessed May 2, 2024]). Any view endorsing this conduct as the basis for police intervention would countenance seizures based on the ordinary and banal, with their attendant risk of "dangerous, sometimes fatal outcomes for both individuals and officers" (People v Johnson, 40 NY3d 172, 193 [2023, Rivera, J., concurring]).
The majority's resolution of this case under a "community caretaking doctrine" is unnecessary and misguided. First, "[w]e are bound, of course, by principles of judicial restraint not to decide questions unnecessary to the disposition of the appeal" (People v Carvajal, 6 NY3d 305, 316 [2005]). The prosecution's and defendant's insistence that we "consider the community caretaking doctrine and provide guidance on its parameters" does not displace those principles (majority op at 
280). Neither court below expressly mentioned or relied on any such community caretaking doctrine to conclude that the seizure was constitutional. Thus, the majority announces a new rule without analyzing why the lower courts' reasoning is erroneous or why our law as it stands is inadequate to resolve this appeal.
The record in this case also renders it wholly "unnecessary" to break new ground here (Carvajal, 6 NY3d at 316). Officer Haskovic did not know what was happening in the car before he stopped it, testifying that he thought "possibly somebody . . . needed some sort of aid or something was going on in that vehicle" and admitting on cross-examination that he "thought something illegal might be going on." Thus, as the majority acknowledges (see majority op at 
277 n 3), potential criminal activity factored into the officer's decision to stop defendant. In my view, our familiar, well-established standards for a vehicular stop apply (see Hinshaw, 35 NY3d at 430). For these same reasons, we have no occasion to consider the arguments by the prosecution and defendant about the contours and application{**42 NY3d at 286} of a different standard based on an amorphous community caretaking function.[FN*]
Second, the majority creates confusion. It provides no clear definition of what constitutes a "community caretaking function," leaving it to police officers to test its limits. At best community caretaking appears to be a catchall for police action that does not facially involve the investigation of criminal conduct—an uncertain constitutional terrain. The phrase "community caretaking" originally appeared in Cady v Dombrowski, a case that involved the towing and evidence-yielding inventory of a vehicle disabled after an accident, as a mere passing recognition that officers sometimes address public safety concerns unrelated to criminal activity (413 US 433, 441 [1973]). Specifically, the Court remarked that police "frequently investigate vehicle accidents in which there is no [*8]claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" (id.). Three years later, the Supreme Court drew on Cady to cement its inventory-search jurisprudence, and again made passing reference to what it previously "ha[d] called 'community caretaking functions' " to declare that "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge" (South Dakota v Opperman, 428 US 364, 368-369 [1976]). From there, courts around the country began citing Cady as support for a "community caretaking doctrine" (majority op at 
274-275 [collecting cases]).
Indeed, post-Cady this Court acknowledged—also in passing and without mentioning Cady's reference to "community caretaking"—that police officers are public servants that perform many governmental functions that are unrelated to crime control (see People v De Bour, 40 NY2d 210, 218 [1976]). For better or for worse, officers are called upon to address situations that might have been resolved (perhaps more appropriately{**42 NY3d at 287} or less costly) by someone with a particular expertise who is not a law enforcement official (see Michael Maciag, The Daily Crisis Cops Aren't Trained to Handle, Governing [Apr. 27, 2016], available at 
https://governing.com/archive/gov-mental-health-crisis-training-police.html [last accessed May 2, 2024] ["In the country as a whole, mental health situations are responsible for about 1 in 10 police calls"]; Hasan T. Arslan, Examining Police Interactions with the Mentally Ill in the United States, in Enhancing Police Service Delivery: Global Perspectives and Contemporary Policy Implications 95, 98 [James F. Albrecht & Garth den Heyer eds 2021] [presenting data suggesting that, from 2016 through 2021, nearly 25% of people killed by police officers suffered from mental illness]). The Court has observed that "over 50% of police work is spent in pursuits unrelated to crime" (De Bour, 40 NY2d at 218). Consequently, the Court has said that "unrealistic restrictions on the authority to approach individuals would hamper the police in the performance of their other vital tasks" (id.). "This is not to say that constitutional rights to privacy and freedom from unreasonable searches and seizures must be abandoned to accommodate the public service aspect of the police function" (id.). "The overriding requirement of reasonableness in any event, must prevail" (id.).
However, in Caniglia v Strom, the Supreme Court strongly signaled its disapproval of intrusions justified on so-called community caretaking grounds and suggested that Cady did not mark the introduction of a separate community-caretaking doctrine (593 US 194 [2021]). In Caniglia, the Supreme Court sharply criticized the Circuit Court for having "extrapolated" from its "statement" in Cady "a freestanding community-caretaking exception that applies to both cars and homes" (id. at 197). In doing so, the Court clarified that Cady's "reference to 'community caretaking' " and "recognition that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere" (593 US 194, 199 [2021], citing Cady, 413 US at 441). The separate writings in Caniglia indicate that several members of the Supreme Court likely view these tasks as more akin to responses to emergencies that implicate the imminent-danger exception to the warrant requirement (see id. at 199-200 [Roberts, Ch. J., concurring] [noting that "(a) warrant to enter a home is not required . . . when there is a 'need to assist persons who are seriously {**42 NY3d at 288}injured or threatened with such injury' "], quoting Brigham City v Stuart, 547 US 398, 403 [2006]; id. at 202-203 [Alito, J., concurring] [observing that the Supreme Court's "precedents do not address situations" where police make warrantless entries into the homes of individuals injured but unable to call for assistance]; id. at 206 [Kavanaugh, J., concurring] ["This case does not require us to explore all the contours of the exigent circumstances doctrine as applied to emergency-aid situations because the officers here disclaimed reliance on that doctrine"]). The majority ignores these signals, justifying its adoption of a broad community caretaking carveout from the Fourth Amendment's familiar strictures primarily with references to state court decisions, all of which predate Caniglia (see majority op at 
274-275).
The majority's community caretaking rule carves away a large portion of Fourth Amendment jurisprudence as a solution in search of a problem. Our precedents already permit officers to act quickly in response to true emergencies, as the officer in this case purported to do. If someone is yelling for help in a building, or a car is sparking at risk of fire, officers are already permitted to intervene (see De Bour, 40 NY2d at 218-219). Much of what other courts embracing the exception treat as community caretaking is, in actuality, a police response to imminent danger or an example of traditional law enforcement for which prevailing Fourth Amendment principles already account.
For example, the majority cites to Byram v State (see majority op at 
278), where Texas's high court upheld a stop of a moving vehicle based on the officer's observation of signs that its passenger was "suffering from alcohol poisoning," as she was "hunched over and motionless, as the reek of alcohol wafted out" (510 SW3d 918, 924 [Tex [*9]Crim App 2017]). However, this set of circumstances better resembles an emergency wherein an individual is in need of imminent intervention, not community caretaking (see Brigham City, 547 US at 406). The same goes for the majority's reliance on State v Rohde (see majority op at &mdash), where Nebraska's intermediate appellate court upheld a stop based on a passenger's standing up through the car's moonroof and waiving her arms toward the officer "before disappearing back into the vehicle" because this "indicated a high level of distress signifying that the passenger may have been in danger" (22 Neb App 926, 942-943, 864 NW2d 704, 715 [2015]). Or, take the majority's reference to State v Hinton (see{**42 NY3d at 289} majority op at 
281), where the Supreme Court of Vermont upheld the stop of a moving vehicle by an officer parked near a downed tree to stop and divert drivers, during which he observed defendant exhibiting signs of intoxication (198 Vt 167, 168, 173, 112 A3d 770, 771-772, 775 [2014]). However, this approximates a nonprogrammatic, but "tailored roadblock" set up in response to a sudden problem that "the Fourth Amendment would almost certainly permit" under the Supreme Court's current checkpoint jurisprudence (Indianapolis v Edmond, 531 US 32, 44 [2000]).
Here, if Officer Haskovic thought someone in the car was held against their will, that would have required immediate investigation of a crime-in-progress and justified a warrantless seizure to safely secure the individual and apprehend any suspects (see Hinshaw, 35 NY3d at 430). Alternatively, if the officer observed one of the car's occupants in physical distress, the Fourth Amendment permitted the officer to respond to what he perceived as an imminent emergency, and his conduct would have been evaluated under the well-established exigency exception to the warrant requirement (see Stuart, 547 US at 403 [observing that the "exigency" of "emergency (aid)" requires officers to have an objectively reasonable basis for believing that an occupant—there, of a home—is "seriously injured or (imminently) threatened with such injury" before acting without a warrant]). Under either circumstance, the Court has observed, "whereas a policeman's badge may well be a symbol of the community's trust, it should never be considered a license to oppress" (De Bour, 40 NY2d at 220).
The majority observes that one policy-based justification for the doctrine it adopts is "that police officers should be encouraged" to undertake these non-law enforcement multifaceted roles (majority op at 
275). Yet, officers regularly have done so for decades even absent our embrace of community caretaking as an independent basis for police intrusions upon individual liberty (see e.g. De Bour, 40 NY2d at 218). As courts, the police, and society all recognize, police officers historically have engaged in tasks unrelated to ordinary law enforcement. The greater concern is the potential for the majority's community caretaking carveout to encourage unconstitutional stops and seizures based on nothing more than a hunch. That is bad for individuals, the police and society generally (see Johnson, 40 NY3d at 177 [Rivera, J., concurring]).
Given the majority's adoption of a "community caretaking" carveout, we can avoid the danger of more stops by applying{**42 NY3d at 290} the exclusionary rule. Thus, in those cases where a court determines that an officer has acted pursuant to a "community caretaking function," and that there were "specific, objective, and articulable facts that would lead a reasonable officer to conclude that an occupant of the vehicle is in need of assistance," and "the police intrusion [was] narrowly tailored to address the perceived need for assistance" (majority op at 
276), any contraband retrieved or incriminating statement made as a direct result of the police intrusion should be inadmissible against the defendant.
The exclusionary rule "is an essential part of both the Fourth and Fourteenth Amendments" and "[t]o hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment" (Mapp v Ohio, 367 US 643, 656-657 [1961]). Accordingly, the Court has regarded it as "a judicially created tool for the effectuation of constitutionally guaranteed rights" (People v McGrath, 46 NY2d 12, 20 [1978]) whose applicability is most appropriate as the potential for a "foreseeable deterrent effect" against future abuses increases (see People v Jones, 2 NY3d 235, 241 [2004]). The need for such deterrence is greatest where there is a high risk of pretextual police action justified on public safety grounds.
The majority concedes that its new community caretaking doctrine is susceptible to "abuse," yet prohibits the judiciary from applying the exclusionary rule (majority op at 
276, 279n 4, 280-281). This reasoning misunderstands the concept of deterrence lying at the core of the exclusionary rule, which is inherently forward-looking: application of the exclusionary rule in one case aims to quell the temptation for overreach and subterfuge in other, future ones (see Jones, 2 NY3d at 241). By putting on notice "officer[s] engaged in the often competitive enterprise of ferreting out crime" (Johnson v United States, 333 US 10, 14 [1948]), that exploitation of the community caretaking doctrine would be fruitless in that enterprise, only strict application of the exclusionary rule to community caretaking-based intrusions would prevent the majority's new doctrine from spiraling into a judicially-licensed pretext for ordinary crimefighting unbounded by the Fourth Amendment's familiar limitations. As the primary author of the leading [*10]treatise on Fourth Amendment jurisprudence, regularly cited by the United States Supreme Court, has insightfully posited:
"If the fruits of an admittedly illegal search need{**42 NY3d at 291} not be suppressed where there would be a minimal advance in the deterrence of police misconduct, . . . then it is not fanciful to suggest that the exclusionary rule should be employed when the deterrence objective could be substantially advanced, without regard to whether it is certain that an improperly motivated search actually occurred in the particular case" (3 Wayne R. LaFave et al., Search & Seizure § 7.5 [e], Pretext arrest, detention, impoundment or inventory [6th ed, Mar. 2024 update] [internal quotation marks omitted]).
Moreover, nothing suggests that application of the exclusionary rule to evidence the police happen upon while carrying out these tasks will compel officers to stop assisting the public unless criminality is readily apparent. After all, an officer who complies with the majority's standard has not violated a defendant's rights and thus acts without fear of reprisal or civil liability.
In sum, whether a police officer has violated the Fourth Amendment distills to whether the officer's actions were objectively reasonable, even when responding to a potential noncriminal public safety issue. We need not look beyond our borders for new rules. Here, the stop based on the unremarkable occurrence of the passenger side door quickly swinging open and closed was unreasonable because it did not evince criminal activity or a need to provide emergency assistance to someone in distress.
Judges Garcia, Singas, Cannataro and Halligan concur. Judge Rivera concurs in result in an opinion, in which Chief Judge Wilson concurs.
Order reversed and indictment dismissed.

Footnotes

Footnote 1: The court subsequently reopened the suppression hearing, for reasons not relevant here, and adhered to its prior decision.

Footnote 2: The People do not contend that the emergency exception to the warrant requirement has any application here (see generally Molnar, 98 NY2d at 332).

Footnote 3:The concurrence argues that because Haskovic admitted on cross-examination that "potential criminal activity factored into [his] decision to stop" the vehicle, we need not consider the community caretaking doctrine (concurring op at 
285-286). But Haskovic's testimony was consistent with his expressed concern about passenger safety. Haskovic was asked, "So—and the fact of the matter is, the car wasn't being stopped based on the fact that you perceived that to be a traffic infraction, it was stopped for other reasons, like safety, where you thought something illegal might be going on; correct?" Haskovic responded, "Correct." In any event, as the concurrence acknowledges, the standard for determining whether a stop was lawful must be based on objective reasonableness rather than the subjective belief of the officer.

Footnote 4: We disagree with the concurrence that the exclusionary rule should be applied to any evidence recovered during the course of a valid community caretaking stop (concurring op at 
289-291). The exclusionary rule "prohibits the use of evidence obtained in violation of an accused's Fourth Amendment rights in a criminal proceeding" (People v Young, 55 NY2d 419, 424 [1982]; see also People v Arnau, 58 NY2d 27, 32 [1982] ["(E)vidence which is obtained as a result of illegal police activity may not be used against a defendant at (a) criminal trial"]). Where the automobile stop is lawful, and therefore the defendant's constitutional rights have not been violated, the exclusionary rule is inapplicable (see Livingston, Police, Community Caretaking, and the Fourth Amendment, 1998 U Chi Legal Forum at 305 ["The Court in the Fourth Amendment context, however, has never held that evidentiary exclusion is proper in the absence of a constitutional violation"]).

Footnote *:For sure, a holding "that the stop violated defendant's constitutional rights, without explaining why, would engender confusion and would leave police and lower courts to supply their own standards as to whether the stop was lawful" (majority op at 
280). But that is what the majority does when, without explaining why the lower courts' determinations were erroneous here, it disregards the intermediate appellate courts' routine invocation of other Fourth Amendment doctrine when confronted with circumstances that it now brings within its new community caretaking doctrine.