People v Arriaga (2025 NY Slip Op 51707(U))

[*1]

People v Arriaga

2025 NY Slip Op 51707(U)

Decided on October 27, 2025

Criminal Court Of The City Of New York, Queens County

Licitra, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 27, 2025

Criminal Court of the City of New York, Queens County

The People of the State of New York

against

Arriaga, Defendant.

Docket No. CR-002566-25QN

For Mr. Arriaga: The Legal Aid Society (by Yash Ramesh)

For the People: Melinda Katz, District Attorney (by Daniel Scully)

Wanda L. Licitra, J.

On June 6, 2025, this court held a combined Huntley/Johnson/Dunaway/Mapp hearing. The following constitutes the court's findings of fact and conclusions of law.

FINDINGS OF FACT

At the hearing, the prosecution called two witnesses, Dong Kim and Daniel Velez-Cozco. Both the prosecution and the defense admitted video footage. The court makes the following specific findings of fact and finds as fact all events depicted in the footage.

Dong Kim is a police officer at the New York City Police Department ("NYPD"). He has worked there for over twenty years and has made over 250 arrests. He is assigned to the 115th Precinct.

On January 19, 2025, Officer Kim was patrolling the area around Roosevelt Avenue between 37th Avenue and 41st Avenue in Queens County. He was working with a partner, Officer Tabile. The two were in a marked police vehicle and wearing their uniforms. At around 3:50 a.m., on 37th Avenue between 92nd Street and 93rd Street, Officer Kim spotted a white Ford Explorer. The Ford was parallel parked on the side of the road with its engine running. There were several cars parked in line directly behind the Ford. There was a "No Parking Anytime" sign about two- or three-car lengths ahead.

Officer Kim pulled over and parked in front of the Ford. He approached the driver's side; Officer Tabile approached the passenger's side. Officer Kim shined his flashlight inside the car and saw a man asleep in the driver's seat. That man was Mr. Arriaga. Officer Kim also saw another man asleep in the back of the vehicle.

Officer Kim testified that "normally" when he approaches a car in a no-parking zone, he "give[s] his discretion to have him move the car." Here, however, Officer Kim testified that he thought Mr. Arriaga was "sleeping or maybe he needed medical attention." The only things Officer Kim observed that made him believe that Mr. Arriaga "maybe . . . needed medical [*2]attention" were that "his head was down," "his phone was on his lap," and "his eyes were closed." Because of these observations, Officer Kim testified that he opened the driver-side door "to make sure" Mr. Arriaga was "okay."

Upon opening the door, Officer Kim asked Mr. Arriaga if he was okay. Mr. Arriaga woke up. Officer Kim questioned him about his license, and Mr. Arriaga said he was only charging his phone and that he was not driving. Officer Kim saw that Mr. Arriaga was holding a phone, which was plugged into the car and charging. He also smelled an alcoholic beverage on Mr. Arriaga's breath and saw that Mr. Arriaga had bloodshot, watery eyes. Officer Kim asked Mr. Arriaga how much he had to drink. Mr. Arriaga said he had six or more beers. Officer Kim asked these questions in both English and Spanish.

Officer Kim told Mr. Arriaga to step out of the vehicle and walk to the front. He administered a portable breath test, which was positive. At 4:02 a.m., Officer Kim arrested Mr. Arriaga. He drove Mr. Arriaga to the 112th Precinct, which houses an Intoxicated Driver Testing Unit ("IDTU"). There, Officer Delaney, another NYPD police officer, asked Mr. Arriaga to submit to a chemical breath test. Officer Delaney asked in English and played an NYPD video to ask the same question in Spanish. At 4:55 a.m., Mr. Arriaga agreed.

Officer Kim did not issue a parking ticket to Mr. Arriaga, nor did he ever issue a parking ticket to any of the other cars parked in line with the white Ford in the zone marked, "No Parking Anytime."

Daniel Velez-Cozco is a Criminal Law Associate with the Queens District Attorney's Office. He speaks English and Spanish fluently. He has interpreted between English and Spanish many times before. Mr. Velez-Cozco opined that the NYPD's IDTU video accurately translated the officer's request for a chemical breath test into Spanish.

CONCLUSIONS OF LAW

At a Johnson/Dunaway/Mapp hearing, the prosecution bears the burden of production. They must establish, at the outset, that the police officers' actions were lawful under constitutional search-and-seizure law. If they do so, the burden of proof shifts to the defense to prove by a preponderance of the evidence that any specific act was unlawful. (See, e.g., People v. Harris, 192 AD3d 151, 157-58 [2d Dep't 2020]). The court must therefore take each act, analyze whether the prosecutor met their burden of production, and if so, analyze whether the defense met their burden of proof.

When analyzing the legality of a police act, what matters is what the intruding officer knew at the time of the intrusion, not what police gathered after the fact. (E.g., People v. Sanchez, 38 NY2d 72, 76 [1975] [noting that reviewing courts must look to "the facts available to the officer at the moment of the seizure"]; Farquharson v. United Parcel Service, 202 AD3d 923, 926 [2d Dep't 2022] [noting that reviewing courts must look to "the sum of the [objective] information known to the police at the time" of the intrusion]).

The constitutionality of police actions is usually reviewed under the four-tier framework of People v. De Bour, 40 NY2d 210 [1976]. First, police may approach a person and request basic, non-threatening information if they have an objective, credible, and articulable reason to do so. (Id.). Such a reason need not be necessarily indicative of criminal activity. (Id. at 222-23). Second, police may ask more pointed questions, but may not seize a person, where they have founded suspicion that criminal activity is afoot. (Id.). Third, police may temporarily detain a [*3]person where they have reasonable suspicion that the person has committed, is committing, or is about to commit a crime. (Id.). And fourth, police may arrest a person when they have probable cause the person has committed a crime. (Id.).

Under this framework, the police lawfully approached the white Ford. Where police come upon a car that is already parked—even when it is parked illegally or its engine is running—their actions are analyzed under De Bour's first level. (See People v. Eugenio, 185 AD3d 1050 [2d Dep't 2020] [approaching legally parked car with engine running was level one]; People v. Noble, 154 AD3d 883 [2d Dep't 2017] [approaching car parked on side of road with engine running was level one]; People v. Carr, 103 AD3d 1194 [4th Dep't 2013] [approaching illegally parked car was level one]; People v. Thomas, 19 AD3d 32 [1st Dep't 2005] [approaching parked car with engine running was level one]; People v. Larkin, 62 Misc 3d 62 [App. Term, 2d Dep't 2018] [approaching oddly parked car with engine running was level one]; People v. Suncar, 66 Misc 3d 672, 683 [Sup. Ct., Bronx County 2019] ["The parked car in the crosswalk allows the police to conduct a level one inquiry."]). Because the Ford was parked in a no-parking zone, the police had an objective, credible, and articulable reason to approach it.

But the De Bour framework cannot justify the police opening the car's door here, an act that amounts to a forcible stop. Where a car is parked, such an action generally requires at least reasonable suspicion of criminal activity. (See, e.g., People v. Rossetti, 148 AD2d 357, 358 [1st Dep't 1989] ["In the absence of any indication of criminal activity . . . there was no basis for opening the car doors."]).[FN1]
Here, Officer Kim observed a car parked in a no-parking zone with a person in the driver's seat apparently asleep. The car was parallel parked in line with several other cars on the side of the road. Nothing about the scene indicated criminal activity.

Still, the analysis does not end there. As case law recognizes, police officers often perform functions unrelated to the investigation and detection of crime. (See, e.g., People v. Brown, 42 NY3d 270 [2024]; Cady v. Dombrowski, 413 U.S. 433, 441 [1973]; South Dakota v. Opperman, 428 U.S. 364, 368-69 [1976]; Brigham City v. Stuart, 547 U.S. 398, 406 [2006]). For instance, police may "assist people in need." (People v. Brown, 42 NY3d 270, 273 [2024]). Police may impound a car "when necessary to protect public safety." (People v. Hinshaw, 35 NY3d 427, 438 [2020]). And "[b]ecause of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways," police may engage in "community caretaking functions" with respect to such vehicles, "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." (Cady v. Dombrowski, 413 U.S. 433, 441 [1973]).

In People v. Brown, 42 NY3d 270, our Court of Appeals laid out a two-step analysis when adjudicating police actions under the "community-caretaking" doctrine. The analysis "weigh[s]" dual concerns: first, that police "are often called upon to provide historically grounded, and usually welcome, aid to those in distress"; and second, "the risk that the community caretaking doctrine may be used by police to circumvent the federal and state constitutional rights afforded to citizens to protect them from unreasonable and unwarranted police intrusions." (Id. at 276 [internal quotation marks omitted]).

Because "the community caretaking doctrine is subject to abuse," Brown stresses that "suppression courts" must "carefully scrutinize" an officer's "community-caretaking" actions. (Id. at 281). That scrutiny must proceed as follows. First, "the officers must point to specific, objective, and articulable facts that would lead a reasonable officer to conclude that an occupant of the vehicle is in need of assistance." (Id. at 276). There must be an "objective basis" to "support the officer's claimed belief" that assistance was needed. (Id. at 277). An objective analysis is not dependent on "the subjective belief of the officer." (Id. at 277 n.2). Second, "the police intrusion must be narrowly tailored to address the perceived need for assistance." (Id. at 276). In other words, the "level of intrusion" must be "commensurate with the perceived need for assistance." (Id. [internal quotation marks omitted]). Courts must therefore consider whether "there [were] less intrusive alternatives for addressing the concern." (Id. at 279). "Once the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure." (Id.).

The record here does not provide reasonable justification for Officer Kim to have opened Mr. Arriaga's door, given what he had observed at the time. The analysis fails at Brown's first step: Officer Kim's observations did not reasonably suggest that the vehicle's occupant needed assistance. Officer Kim saw a vehicle parallel-parked on the side of the road, in line with other vehicles. There was nothing alarming about the way the vehicle was parked. The vehicle did not show signs of a wreck or other damage; no bodies were alarmingly contorted, slumped, or in unusual positions; and there were no signs of injury, weapons, or violence. Officer Kim saw a man asleep, and nothing about the scene reasonably suggested the man needed assistance. There are any number of reasons why a person may sleep in a parked car on a winter night. They may be tired; they may be seeking warmth; they may live in their car. Even in the daytime, a person sleeping in a parked car is not reason alone to believe that they require medical assistance. (Accord State v. Harris, 9 Wash. App.2d 625, 634 [Wash. App. Ct. 2019] ["The mere fact of a person sleeping in a car during the day, without any accompanying observations of a possible medical issue or drug use, would not lead a reasonable person to believe that an emergency existed."]). Thus, there was no justification for Officer Kim to open Mr. Arriaga's door "to make sure he [was] okay." Even if the court concluded otherwise, the analysis would nonetheless fail at Brown's second step. Instead of opening the car door, Officer Kim should have engaged in far less intrusive alternatives, like knocking on the window or attempting to verbally rouse Mr. Arriaga. (Accord id. at 633 [under the community-caretaking doctrine, officers should have at least "briefly attempt[ed] to speak to or otherwise rouse" a person asleep in a car before "opening [the] car door"]).

Still, while Brown's standard speaks of people "in need of assistance," (42 NY3d 276), it also envisions the community-caretaking doctrine as going beyond "true emergencies" to "encompass[] far less time-sensitive concerns where neither persons nor property would be placed in substantial jeopardy by failing to act immediately," (id. at 280 [internal quotation [*4]marks omitted]). Addressing parking violations could be understood as part of an officer's community-caretaking function. (See, e.g., Opperman, 428 U.S. at 368). If so, the relevant analysis should, "in short," follow the same tack: a police officer's actions "are permitted when [objectively] reasonable but only when [objectively] reasonable." (See Brown, 42 NY3d at 276 [internal quotation marks omitted]).

Here, it is difficult to envision why opening Mr. Arriaga's door would be reasonably commensurate with dealing with the alleged parking violation. There were far lesser intrusions available. Officer Kim could have written a parking summons and placed it on the dashboard; or he could have knocked on the window to wake up Mr. Arriaga and communicate with him about the no-parking zone. Instead of taking any of these actions which would have reasonably related to the parking violation, Officer Kim unnecessarily escalated the scene to a temporary detention. That escalation was not reasonable.

Because Officer Kim unlawfully opened Mr. Arriaga's car door, all fruits flowing from that act are suppressed. Those fruits include Officer Kim's subsequent observations; all of Mr. Arriaga's alleged statements; and the results of Mr. Arriaga's chemical breath test.

The Johnson/Dunaway/Mapp motion is granted. Any remaining suppression issues not addressed herein are moot.

The foregoing constitutes the order and decision of the court.

Dated: October 27, 2025
Queens, NY
Wanda L. Licitra, J.C.C.

Footnotes

Footnote 1:This rule plays out differently when police stop a moving vehicle than when they approach a parked car. (See People v. Harrison, 57 NY2d 470, 475-76 [1982]; People v. Thomas, 275 AD2d 276, 278 [1st Dep't 2000]; People v. Larkin, 62 Misc 3d 62, 66 [App. Term, 2d Dep't 2018]). Where officers stop a moving vehicle, they can open the person's door or order them out of the car because, at that point, police have "already lawfully" seized the person. (Harrison, 57 NY2d at 477 [internal quotation marks omitted]). Thus, such an "incremental intrusion . . . once the driver ha[s] been lawfully stopped can only be described as de minimis." (Id. [internal quotation marks omitted]). The same reasoning does not apply when police approach a car that is already parked. In that situation, police have not yet detained the person at all.